422 A.2d 572

COMMONWEALTH of Pennsylvania ex rel. Roger E. GRIMES, Jr., Roger E. Grimes, III and Meredith N. Grimes

v.

**Carolyn M. GRIMES, Appellant.**

Superior Court of Pennsylvania.

Argued April 11, 1979.

Filed Oct. 3, 1980.

Edward P. Zemprelli, Clairton, for appellant.

Bernerd A. Buzgon, Lebanon, for appellee.

Before VAN der VOORT, SPAETH and WATKINS, JJ.

WATKINS, Judge:

This is an appeal from an order of the Court of Common Pleas of Lebanon County, by the appellant–wife, Carolyn Grimes, appealing an order which granted custody of the parties' two minor children to the appellee–husband, Roger E. Grimes.

The parties were married in 1967. They had two children; Roger, III, born October 2, 1967 and Meredith, born July 24, 1970. The parties were divorced in 1974. Prior to the divorce they had entered into an agreement dated July 26, 1974 which, inter alia, provided that the appellant was to have custody of the aforesaid minor children. On June 6, 1977, the appellee filed an action requesting custody of the children. Testimony was taken thereon on August 24 and 25, 1977 and on August 29, 1977, the court below entered the order awarding custody of the children to their father. The appellant filed exceptions to the order of the court below and on July 25, 1978, the court below rendered its opinion dismissing the appellant's exceptions. This appeal followed.

During the testimony taken during the trial of this case it was established that, although the mother had custody of the children, that they spent much time each week with the father and his parents. It was also established that both the father and the mother had spent considerable time with the children and had demonstrated great concern over their development and welfare. However, it was also shown that the mother had had non–marital affairs with two (2) different men during the same period of time. Neither man abused the children. In fact both appeared to have taken well to children. The affairs with both men were pursued with discretion but both men had, from time to time, slept with the appellant in the home where she resided with the children. On appeal, the appellant argues that custody of the children should not have been taken from her due to her non–marital relationships.

The sole issue to be decided in custody proceedings between contending parents is the best interest of the chil-

dren. *Commonwealth ex rel. Holschuh v. Holland,* 448 Pa. 437, 292 A.2d 380 (1972). The mere ·fact of a parent's non–marital relationship is not sufficient to deny him or her custody of the children. *Gunter v. Gunter,* 240 Pa.Super. 382, 361 A.2d 307 (1976). However, a parent's non–marital relationship must be given close scrutiny in determining custody proceedings. The guiding polestar in deciding such matters is the best interests of the children and the non–marital relationship is merely one of the factors which the court must consider in rendering its decision. *Gunter v. Gunter,* supra. It is the effect of the non–marital relationship on the children and not the fact of the relationship itself which is the crucial factor to be considered by the court. *Commonwealth ex rel. Myers v. Myers,* 468 Pa. 134, 360 A.2d 587 (1976). In the instant case the court below found that appellant's non–marital relationships were having a detrimental effect on the children because the children were being provided a bad example by the mother in that her relationships were with different men and were not stable. It is clear from the court's opinion, however, that this was not the sole reason that it awarded custody of the children to their father. In its opinion it enunciated other circumstances pertaining to the parties' conduct with the children and found that the father had shown a greater interest in Roger's school work, that the mother's conduct after the custody action had been filed was not in the best interests of the children as she had restricted their father's visitation privileges in apparent retaliation for his initiating the custody action, and that she had left Roger alone in the house for a 2 and ½ hour period when he was sick. In summary, we hold that the mere fact of a parent's non–marital relationship is not sufficient grounds to deny him or her of the custody of the children and if the evidence shows that such conduct has not adversely affected the children, and the parent has taken good care of the children, the best interests of the children *may* be served by placing custody with said parent. Because a non–marital relationship is only one factor to be considered in determining custody and because the court in the instant case did not confine its

decision awarding custody to the father to the mother's non–marital relationship we must continue our inquiry to determine whether the court below was correct in its finding to the effect that the best interests of the children would be served by placing custody of them with their father.

■ Appellant's second contention is that the weight of the evidence produced at trial demonstrated that the best interest of the children would be served if she were awarded custody. The appellant argues that the appellee had the burden of proving that he should have custody since the parties' original separation agreement, executed in 1974, provided that she was to have custody and because appellee was the one seeking to alter the status quo. The appellant argues that appellee has failed to carry that burden. Based upon the trial testimony the court below found that the children were spending great amounts of time with both parents. They generally slept overnight at the house in which appellant resided. The court found that during the school year the children would go from appellant's home to the home of appellee's parents where they were seen off to school; at the end of the school day they would return to the grandparents' home, spend some time with their father at that home or his; have dinner with him at either home, and then return to appellant's home to sleep and to repeat the pattern the next day. The appellant also points to the fact that during the trial, the trial judge interviewed both children in chambers without permitting either attorney to be present during the interview. The appellant alleges that this was error citing *Commonwealth ex rel. Lee v. Lee*, 248 Pa.Super. 155, 374 A.2d 1365 (1977). During the interview both children expressed their desire to remain with the appellant. However, a transcript was made of the children's in camera testimony. After asking many questions designed to put the child at ease, Meredith was asked by the trial court the following:

"Q. . . who would you rather go live with, your Mommy or your Daddy?

"A. My Mom".

The following dialogue then occurred:

"Q. Why?

A. Because I just like it the way it is.

Q. You like it the way it is?

A. Uh–huh.

Q. And how is that?

A. What?

Q. And how is that? You say you like it the way it is? Well, how is it?

A. I don't know what you mean.

Q. Well, you're the one that said you like it the way it is, and I would like you to tell me what you mean by that.

A. I just like going to the shore and I like seeing Spoony and Steve." (Appellant's boyfriends)

The girl then went on to testify that she liked the appellee's present wife, her son, and that she also enjoyed her father's company. Roger Grimes testified as follows:

"Q. Why would you prefer to live with your Mommy?

A. I don't know. I just like it the way it is."

Roger then went on to describe various activities which he enjoyed with his father, his present wife, her son, and with his mother. After their testimony the trial judge summarized what they had said to both attorneys. This summary was made part of the record. Prior to taking the children's testimony the court below had discussed his intention to do so with both attorneys and informed them that afterwards he would summarize what was said by the children and give each attorney an opportunity to suggest any additional questions they would like the judge to ask the children and that he would then recall the children and ask them those additional questions. This procedure was followed by the court and after a summary of their testimony was given to the attorneys, each of them stated that he had no more questions to pose to the children. Under these circumstanc-

es we find that the appellant has no cause to complain about the procedure employed by the court. Unlike the situation in *Commonwealth v. Lee*, supra, the court in the instant case did make a transcript of the children's testimony thus presenting us with an opportunity to review same. The court below also gave each attorney a summary of the children's testimony and provided each attorney with an opportunity to question the children through the judge. Where a transcript of the children's testimony in a custody case is kept, the hearing judge made every opportunity to ask impartial questions, to put the children at ease, and to attempt to determine their true feelings toward their parents, the hearing judge did not err in questioning the minor children without counsel being present so long as the judge agreed to allow each party's attorney to pose questions to the children through him. *Cheppa v. Cheppa*, 246 Pa.Super. 149, 369 A.2d 854 (1977). Because the court scrupulously followed this procedure and because both children stated a preference to remain with the appellant during the in camera testimony we hold that the court below did not err when it employed this procedure and that, in any event, the appellant was not prejudiced thereby.

■ The appellant also argues that the court below erred when it permitted appellee to call approximately fourteen character and reputation witnesses including the mayor of Lebanon and the Council president of the Borough of Cornwall. The appellant objected to the introduction of this evidence but was overruled by the court below and the testimony was permitted. The court below stated in its opinion that evidence of reputations of the parents in a custody action, "though never pivotal, because of mercurial and chameleon–like properties in the concept", is relevant and material evidence and must be included in the supply of factors reviewed by a court since a parental reputation "can bring instant and constant grief to children". Although we are mindful that an "array of stars" in the form of celebrity reputation and character witnesses in custody cases may deflect attention from the real issue at hand, i. e. the best

interests of the children, we are constrained to agree with the court below in its analysis of the reputation evidence. The lower court recognized the proper status for such evidence in a custody case when it stated that evidence of "good reputation, or the lack of it, is not critical nor the fulcrum for our lever of judgment. But is is a factor to be weighed with all others". Because the court below recognized the proper weight to be given the reputation evidence we hold that it did not err in admitting same as merely one other element to be considered in determining custody matters.

■ We then return to the critical issue at hand which is whether the court below erred in granting custody to appellee because the weight of the evidence and the law dictating an opposite result. The appellant points to the fact that the children have been with her since 1974 and to the fact that both children expressed a preference to remain with her as factors militating against the court's decision. The record shows that appellee is a college graduate presently employed by the Commonwealth of Pennsylvania in the Department of Community Affairs where he is responsible for administering various grant–in–aid programs. He has been employed in such capacity for seven (7) years and earns between $21,000 to $22,000 per year. The appellee presently resides with his second wife and her nine (9) year old son in Cornwall, Pennsylvania in a home which they had built there. The testimony regarding this home demonstrates that it is more than adequate insofar as size and habitability are concerned and would be an adequate place for the children. The appellee testified that he attends church regularly and brings the children when they are with him but that they would only go to church twice a year when they were with the appellant. The record also revealed that the appellee, his wife, and their son enjoyed very good relations with the children and that they regularly participated in many family activities during visitation periods. The appellee's wife is not employed at present and would be able to devote her full time to raising the children.

The appellant is employed at HERCO, Inc. at the Hershey Motor Lodge where she books meetings, conventions and other gatherings. She earns approximately $11,000 per year plus gratuities which bring her total annual salary to about $12,000 per year. The parties' separation agreement provides that she be permitted to reside in the former marital abode so long as she remains unmarried and has the children. The appellee must then make the mortgage payments and pay certain other bills regarding this home. The appellee suggests an economic motive in appellant's custody petition. However, we note that the appellant also benefits economically from having custody since she had an adequate place to reside, rent free, with certain bills paid when she enjoyed custody of the children. From the testimony adduced of record it does not appear that either parent's overriding consideration in seeking custody was economic. The court below found that although parents apparently loved and cared for the children that the appellee had shown a greater interest in the son's school work and that his situation provided a better moral, physical and spiritual situation for the children. While the mother's non–marital relationships with several men were not sufficient, in themselves, to deprive her of custody of the children they can be considered as one factor in determining custody. *Gunter v. Gunter*, supra. While we may agree with appellant that the lower court might have placed too much emphasis on this factor we cannot say that it committed reversible error when it awarded custody of the children to the father since the court clearly considered many other relevant factors in making its decision. The fact that Meredith Grimes testified that one of the reasons that she desired to remain with her mother was because she liked "Spooney and Steve" (two of her mother's lovers) and the fact that the children were aware of the fact that these men were remaining overnight with their mother (at least on occasion) is evidence that her affairs were having a detrimental effect upon the children as they were being raised in an environment where such conduct was considered acceptable.

 Even though the original custody agreement provided for custody to be with the mother, the father has produced sufficient evidence so as to enable a fact–finder to decide that he is the one better able to provide for all of the children's needs. Thus, even though the seven and nine year old children expressed a preference of remaining with their mother the weight to be given their preference is to be determined by the trial judge. *Commonwealth ex rel. Doberstein v. Doberstein*, 201 Pa.Super. 102, 192 A.2d 154 (1963). Reviewing the testimony of both children relative to their preference we cannot say that the court below erred when it ruled as it did since the children's testimony revealed that they loved both parents, that both parents cared for the children, and that the reason they wished to remain with the mother was that Meredith liked "going to the shore" and seeing "Spooney and Steve" and Roger merely didn't see any reason for a change. Considering the entire situation of both parents we find that the court below did not err when it determined that the children's best interest would be served by placing them with their father.

It should also be noted that the court below granted very extensive visitation rights to the appellant specifically stating three weeks each summer, each Wednesday from 5:30 P.M. to 8:00 P.M., every other weekend Friday to Sunday evening and holidays.

Order affirmed.

SPAETH, J., files a dissenting opinion.

SPAETH, Judge, dissenting:

The lower court committed two errors when it deprived appellant of custody of her two children. First, the lower court permitted appellee to introduce evidence of his general good reputation as part of his case–in–chief. It is settled that such evidence is inadmissible. This case, where appellee is a life–time resident and local celebrity, and appellant a relative outsider, is a vivid illustration of the importance of the rule of inadmissibility. Second, the lower court's order does not represent an adjudication of what is in the chil-

dren's best interest but is instead a penalty imposed upon appellant for what the court regarded as her immoral conduct in having had sexual intercourse with two men. It is settled that a child custody proceeding is not the proper forum in which to penalize a parent for his or her behavior. The only purpose of a custody proceeding is to determine what will be in the best interest of the children. The proper question is always, "What is the effect of this parental behavior on the children?" not, "Is this behavior good or bad?"

–1–

Appellee has lived in Cornwall since he was two years old, except for the years he attended Penn State and played football professionally for the Dallas Cowboys and the Philadelphia Eagles. N.T. 7–8. Cornwall is described in the record as having a population of 2,200 and as being the kind of community where everyone knows everyone else's business. N.T. 319, 323. Appellant was raised in Lebanon, N.T. 571, only came to Cornwall after her marriage, and has no claim to fame remotely approaching that of a professional football player.

Appellee's first witness, after himself, was the Mayor of Lebanon. The mayor testified only as to appellee's good reputation in the community. He did not testify as to appellee's reputation as a parent, did not say that he knew the children, and did not say that he had ever seen appellee with the children. Nor did he testify as to appellant's poor reputation as a parent. All he did was testify to appellee's general good reputation at a point in the proceedings when appellee's character had not in any way been attacked.

In *Greenberg v. Aetna Insurance Company*, 427 Pa. 494, 235 A.2d 582 (1967), our Supreme Court stated the general rule for the admissibility of reputation evidence in a civil case:

In civil actions evidence of good character or reputation "is inadmissible unless directly in issue or involved in the nature of the proceedings, and even then evidence of good character is not admissible unless and until it is attacked

by evidence to the contrary .... [....] To be in issue in a technical sense, character must be of particular importance and therefore a material fact in the case." Henry, Penna. Evidence (4th ed. 1953) § 152 (Footnote omitted.) *Id.*, 427 Pa. at 498, 235 A.2d at 584.

This is so settled a principle that although *Greenberg* is cited as standing for it in numerous secondary sources,[1] no Pennsylvania appellate court has had so to cite it until today.

Neither the lower court nor the majority cites any authority in support of the admission of appellee's general good reputation; I have been unable to find any case in any state that supports it. The majority says that the lower court "recognized the proper weight to be given the reputation evidence," at 576; but when one examines the lower court's opinion, one sees, not only that this is not so, but that the lower court entirely missed the point. The lower court says that "a parental reputation which can bring instant and constant grief to children, thus adversely affecting their relationship with the custodial parent, must be included in the supply of factors reviewed ...." Slip op. at 13. The lower court also says that "[o]ne question to be asked is whether the children should be thrust into or returned to a situation where they cannot avoid the impact of an adverse reputation." Slip op. at 14. The point is not the admissibility of evidence of *bad* reputation–"which can bring instant and constant grief to the children"–but of *good* reputation. I agree that it may be proper for one parent to prove that the other parent has a bad reputation. *Herr v. Lazor*, 238 Iowa 518, 28 N.W.2d 11 (1947). Appellee, however, did not call the Mayor of Lebanon to prove that appellant had a bad reputation but to prove that he himself had a good reputation.

As explained more than thirty years ago by Mr. Justice JACKSON, the limitations that have been developed over the years on the use of reputation evidence are based on the

1. *E. g.*, 14 P.L.E., Evidence § 56 (1979 Cum.Supp.); 32 C.J.S. Evidence § 423 (1980 Cum.Supp.); 1 Wigmore, Evidence § 64 (3d ed. 1940) (1979 Supp.)

concern, born of experience, that it often distorts the fact–finding process by precluding dispassionate judgment. *Michelson v. United States*, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948). It is fundamental that evidence must be excluded where its probative value is outweighed by the unfair prejudice that may result from its admission. *See, e. g., Commonwealth v. Hickman*, 453 Pa. 427, 309 A.2d 564 (1973). Unfairness is manifest here. Not only the Mayor of Lebanon, but nine other witnesses, including the President of the Cornwall Borough Council, testified to appellee's general good reputation, as part of appellee's case–in–chief, and when appellee's character had not in any way been attacked. We should not sanction but condemn such a procedure. Children are not to be awarded the famous over the humble.

–2–

Since her divorce from appellee in 1974, appellant has had sexual intercourse with two men. Both men were subpoenaed by appellee, and their uncontradicted testimony may be summarized as follows. One of the men first met appellant in 1973 but their relationship did not become intimate until early 1975. N.T. 341–342. During the following two and a half years he spent fifty or more nights with appellant in her house but they never had intercourse when the children were in the house and awake. N.T. 365–368. The second man met appellant in March 1977, four months before the hearing in the lower court. N.T. 370. They had had intercourse less than six times and never while the children were in the house. N.T. 372–373. They spent "[s]everal, more than six," nights together but the only two times he spent the night when the children were in the house he slept on the couch. N.T. 377, 381–382.[2]

The lower court made plain its disapproval of this conduct. Thus the court said: "We find it to be witless judgment and in poor taste on [appellant's] part." Slip op. at 8. The court also referred to the circumstances as "insidious," slip op. at

2. The lower court's statement of the facts implies that both men had intercourse with appellant in her house when the children were there. *See* slip op. at 7.

9, and appellant's "transgression" as "grievous," *id.* However understandable, these expressions of disapproval did not address the issue before the court.

Everyone develops a code of personal conduct. It does not follow that one is entitled to impose that code on others, or penalize those who do not conform to it. Especially in a child custody case is it important that the hearing judge distinguish between his personal code of conduct, and his determination of what is in the children's best interest. One may believe, with the utmost conviction, that certain conduct is wrong, and yet it may be that that belief should have little or no part in determining who should have custody of the children. A judge may believe that "lips that touch liquor shall never touch mine," but he is not for that reason to deny custody to a mother who drinks. A judge may be a devout churchgoer, but he is not for that reason to deny custody to a mother who does not go to church. Or, as here, a judge may believe that it is immoral for an unmarried woman to have sexual intercourse, but he is not for that reason to deny her custody of her children. *See Commonwealth ex rel. Myers v. Myers,* 468 Pa. 134, 360 A.2d 587 (1976) (collecting and discussing cases); *Gunter v. Gunter,* 240 Pa.Super. 382, 361 A.2d 307 (1976). Of course, "a parent's nonmarital relationships must be given close scrutiny in determining custody matters." *Commonwealth ex rel. Myers v. Myers, supra,* 468 Pa. at 138, 360 A.2d at 589. The purpose of the scrutiny, however, is only to determine the impact of the relationship on the children:

[I]t is the effect of the nonmarital relationship on the child and not the fact of the relationship itself which is crucial to a custody decision. If the evidence shows that a parent's conduct has had harmful effects on the child the court may be justified in denying custody to that parent. On the other hand, if the evidence shows that the parent's conduct has not adversely affected the child and that the parent has taken good care of the child, then the best interests of the child may dictate that the parent retain custody. In each case, all relevant circumstances must be examined to determine what action would be in the best

interests of the child. *Commonwealth ex rel. Myers v. Myers, supra,* 468 Pa. at 141, 360 A.2d at 590.

The controlling words in this statement of the law are, "if the evidence shows . . . ." The court must never assume, or infer, that simply because a nonmarital relationship exists, the impact of the relationship on the children has been harmful. The evidence must show that it has been harmful, and this is so whether the nonmarital relationship, as in *Myers* and *Gunter,* approaches a *de facto* marriage or, as in this case, is more transient. *Rupp v. Rupp,* 268 Pa.Super. 467, 408 A.2d 883 (1979). *See also Commonwealth ex rel. Drum v. Drum,* 263 Pa.Super. 248, 397 A.2d 1192 (1979) (SPAETH, J., dissenting opinion).

In the present case, the lower court specifically refused to follow the law as thus stated in the cases. Instead of examining the evidence to determine whether it showed that appellant's nonmarital relationships had had any harmful impact on the children, and then stating that determination in the form of specific findings of fact, the lower court said:

> But the non–marital affairs here *had to* adversely affect the children if only subconsciously, because of the number of times one of the two men with whom [appellant] was keeping company, spent the night and was seen first thing in the morning by the children. During the same period a second man stayed overnight with [appellant] at different times than the first man, also with the knowledge of the children. Slip op. at 7 (emphasis added).[3]

Later in its opinion the lower court attempts to justify its resort to inference, and its failure to make specific findings of fact showing harmful effect, by saying:

> Must we wait to see some further manifestation of destructive effect sometime in the children's teen years to determine the degree of adversity? We think not. Slip op. at 8.

And the court goes on to ask:

> How can the children, though allegedly showing no outward visible sign of the immoral effect thereof [*i. e.,* of

**3.** This statement of the facts is misleading. *See* footnote 2, *supra.*

appellant's non–marital relationships], *help but be influenced* in the wrong direction[?] Slip op. at 8 (emphasis added).

Thus the court makes plain that in its opinion, and despite such cases as *Myers* and *Gunter*, it is entitled to infer, simply from the evidence that appellant had nonmarital relationships, that the relationships "had to" have a harmful impact on the children.

–3–

The majority opinion suggests that despite the lower court's refusal to follow *Myers* and *Gunter*, its award of custody should be affirmed. Thus the majority says:

> While we may agree with appellant that the lower court might have placed too much emphasis on this factor [*i. e.*, appellant's nonmarital relationships] we cannot say that it committed reversible error when it awarded custody of the children to the father since the court clearly considered many other relevant factors in making its decision. At 577.

I submit that this statement will not withstand examination. The majority fails to identify the "many other relevant factors" it says the lower court "clearly considered." When the lower court's opinion is read in light of the record, it becomes plain that in fact the lower court did not consider many other factors, but to the contrary, that its disapproval of appellant's "grievous transgression" swept aside all other considerations.

The lower court makes much of the fact that when it interviewed Meredith she gave as a reason for wanting to stay with appellant that she liked seeing Spoony and Steve (appellant's men friends). In the lower court's words: "In preference to her father she wants to be around her mother's boyfriends, and at no fault of her father!" Slip op. at 7. This is a most unfair reading of what the child said. As the dialogue reprinted by the majority indicates, Meredith, who we must remember was only seven years old, had difficulty articulating her reasons for wanting to stay with appellant.

She had no difficulty in saying that it was appellant she wanted to live with and that she liked things the way they were; it was only after the lower court pressed her at some length that she mentioned seeing Spoony and Steve, and then as only *one* aspect of what she liked about the status quo; the *other* aspect was "going to the shore," which the record shows she did with her father as well as with her mother.

The lower court goes on to say that Meredith "has not been given a chance to fully develop her relationship with her father as circumstances *sans* other men would and should otherwise permit." Slip op. at 7. I find this very troubling. Since when is a mother, divorced and living with her children, obliged to forgo *any* relationship with other men, on the theory that otherwise her children's relationship with their father may not "fully develop"?

One would suppose that if a child expresses a preference of living with a parent, that expression will usually count in the parent's favor. It may not count for much or even anything at all, because the child may be very young, *Shoup v. Shoup*, 257 Pa.Super. 263, 390 A.2d 814 (1978); *Commonwealth ex rel. Doberstein v. Doberstein*, 201 Pa.Super. 102, 192 A.2d 154 (1963), but one would hardly expect it to count *against* the parent. Yet here, the lower court turns Meredith's statement that she prefers to live with appellant against appellant.

There are other things the lower court turns against appellant, although one would expect them to count in appellant's favor.

After her divorce appellant became employed. The parties' separation agreement, whereby appellant and the children lived in the former family home and appellee paid certain of the children's expenses but did not provide appellant with any cash support, clearly assumed that appellant would be employed. Because appellee and his parents lived close by, and because appellant did not want to limit her children's contact with their father and paternal grandparents, the children spent a considerable amount of time

before and after school and at other times with their father and grandparents. The result was that the children spent far more time with appellee and members of his family than was called for by the visitation schedule in the separation agreement, and little or no time with non–family baby sitters. All of the testimony was to the effect that the children were thriving under these arrangements, as the lower court noted in its opinion. Slip op. at 5. And yet, the lower court criticizes appellant, saying that "with a bit more effort she could have given more of herself to her children. Even by her own admission she could have stopped working, spent more time with the children and forced the monetary issue with their father." Slip op. at 4. It seems odd to me to criticize a mother for not "forc[ing] the monetary issue," while not criticizing the father for his failure to provide support. Such criticism hardly reflects a dispassionate or even–handed treatment of the parties. Furthermore, while a parent's work schedule is certainly relevant in deciding what is in the children's best interest, a mother is not to be penalized because she must work for living. *Cf. Commonwealth ex rel. Lovell v. Shaw*, 202 Pa.Super. 339, 195 A.2d 878 (1963). *See also Commonwealth ex rel. Holschuh v. Holland–Moritz*, 448 Pa. 437, 292 A.2d 380 (1972).

After appellee instituted the custody proceeding, appellant on the advice of counsel limited the children's time with their father and his family to the amounts specified in the separation agreement. Although acknowledging that she had acted on advice of counsel, the lower court nonetheless found that appellant's action "smack[ed] of footballism" and belied her testimony that she believed her prior generosity with visitation had been in the children's best interest. Slip op. at 10. Again, I find such criticism odd, and unfair. It was appellee who initiated the custody litigation. He was therefore at least as responsible for disturbing the children's lives as appellant. Why should appellant be charged with "footballism" for following her attorney's advice, and not appellee?

Every indication from the record is that appellant believed that the coincidence of her need to work, her desire not to limit the children's contact with their father, and the availability and willingness to help of the paternal grandparents, was fortunate for all concerned. Now, however, instead of being given credit for adjusting to a difficult situation in a generous way, she finds herself accused of being insensitive to her children's welfare, and is told, in effect, that the transfer of custody from her to appellee is of no great consequence because the children have already spent so much time with appellee and his parents.

Finally, the lower court discusses a number of "instances of seeming callousness on [appellant's] part [which] when taken in isolation of each other . . . signified nothing ponderous [b]ut when viewed altogether . . . yield an unfavorable reflection." Slip op. at 4. It is far from clear to me that even taken together and as described by the court these events have enough weight to be considered in a child custody action. But far more disturbing, and more indicative of the court's unrelenting attitude toward appellant, is the court's failure to acknowledge appellant's accounts of these events. It is true that as the finder of fact it was the hearing judge's duty to make determinations of credibility; he was not required to believe appellant or any other witness. However, when the hearing judge does not find a witness credible, he still must discuss the testimony and explain why he does not believe it. *Kimmey v. Kimmey,* 269 Pa.Super. 346, 409 A.2d 1178 (1979).

The court wrote that "[appellant] refused Meredith permission to cross the street fronting their property to show her father and grandparents . . . the doll she received for her birthday–a pathetic picture of a child running to the curb, showing the doll briefly from afar, then abruptly turning away and entering her house." Slip op. at 4. This dramatic presentation totally ignores appellant's testimony that she did not know the father and grandparents were outside, and that in asking to cross the street, Meredith gave no indication of why she wanted to cross; appellant was

inside the house and simply wanted her young daughter to stay in the yard unless there was some good reason for her to leave. N.T. 597. In any case, one is bound to ask why it would not have been perfectly easy for the father and grandparents themselves to have crossed the street–but there is no mention of this by the lower court. The court's other examples of "callousness" are similar; and in each case the court fails to acknowledge appellant's version of the event.

In summary, one leaves the lower court's opinion persuaded that the court's conviction that appellant was an immoral person was so strong that it disabled the court from viewing the evidence in a dispassionate manner, and as required by law, in particular, by such decisions as *Commonwealth ex rel. Myers v. Myers, supra*, and *Gunter v. Gunter, supra*.

–4–

The question remains of what remedy we should grant appellant.

Our Supreme Court has just emphasized the importance it places on continuity in children's lives by reversing an order by which we had provided for a change of custody from grandparent to parent over the objection of the child. *Ellerbe v. Hooks*, 490 Pa. 363, 416 A.2d 512 (1980), *rev'g*, 257 Pa.Super. 219, 390 A.2d 791 (1978). It has now been three years since the hearing in this case. The lower court made its order transferring custody effective immediately, denying appellant's application for a stay pending its consideration of her exceptions. It then took the lower court eleven months to consider and deny the exceptions and write its opinion, and, most unfortunately, it has taken another two years for the case to make its way through this court.

In child custody cases it is the present best interest of the children that counts. Thus any change in circumstances during the appellate process requires consideration. *Commonwealth ex rel. Hulschuh v. Holland–Moritz, supra*. Therefore, although I believe that appellant was improperly deprived of custody of her children three years ago, the

proper alternative at this point is not reversal but remand. On remand, however, I should order that the matter be heard before a different judge, who would hear the case *de novo*, receiving such testimony as necessary to bring the record up to date. This should include testimony as to the present preferences of the children who, at their present ages, may be expected to be more able to speak for themselves than they were three years ago.

The case should be remanded for further proceedings consistent with this opinion.