439 A.2d 187

**ROBERT H. H.**

v.

**MAY L. H., Appellant.**

Superior Court of Pennsylvania.

Argued Sept. 21, 1981.

Filed Dec. 29, 1981.

As Amended Feb. 26, 1982.

432

John J. Krafsig, Jr., Harrisburg, for appellant.

Harry B. Goldberg, Harrisburg, for appellee.

Before BROSKY, McEWEN and BECK, JJ.

BROSKY, Judge:

This is an appeal from an award of custody to the father of two children, Kimberly D. H., his adopted child, and Jessica L. H., a natural child of the parties. We have before us an extensive record in which is disclosed a hotly contested dispute regarding the custody of their children. Kimberly D. H. was 11 years old and Jessica L. H. was 8 years old at the time of the custody hearing. The parties were married on September 29, 1972. The opinion which supports the order of the trial court is only three pages long. There is a noticeable absence of any analysis of the facts disclosed in the record regarding the relationship of the custodial parent, at the time of the hearing, May L. H., to her children. Rather, there is only a brief and condemning discussion of her romantic relationships, occurring at different times in the course of the parties' separation, with three men. The record clearly indicates that the children are predisposed to living with their mother and that they have a strong bond with their mother. For the reasons that follow, we reverse the decision of the trial court and remand to the trial court with the direction that custody of the children be awarded to the appellant, May L. H.

Our scope of review in custody disputes is very broad. *Commonwealth ex rel. Spriggs v. Carson*, 470 Pa. 290, 368 A.2d 635 (1977); *Commonwealth ex rel. Myers v. Myers*, 468 Pa. 134, 360 A.2d 587 (1976). We will review the record very closely not with a mind toward usurping the fact-finding function of the trial court, but with a responsible eye searching to ferret out what is in the "best interest of the children." *In re Custody of White*, 270 Pa.Super. 165, 411 A.2d 231 (1979). Accordingly, we are not bound by the deductions and inferences made by the judge who heard the dispute. *Trefsgar v. Trefsgar*, 261 Pa.Super. 1, 395 A.2d 273 (1978); *Commonwealth ex rel. Ulmer v. Ulmer*, 231 Pa.Super. 144, 331 A.2d 665 (1974). Thus, we make an independent review of the evidence and render an independent judgment which will assure that the Commonwealth's justifiable concern for the health and safety of its children is

met. *Spells v. Spells,* 250 Pa.Super. 168, 378 A.2d 879 (1979). Our review, therefore, requires not only a thoroughly developed and complete record, *Augustine v. Augustine,* 228 Pa.Super. 312, 324 A.2d 477 (1974), but a comprehensive and well-reasoned opinion which analyzes the facts disclosed in the record in a manner which clearly demonstrates the necessity for placing custody with either the petitioner or respondent. *Martincheck v. Martincheck,* 262 Pa.Super. 346, 396 A.2d 788 (1979). Hence, we shall engage in a broad and comprehensive review of the record and reach an independent decision regarding the placement of the children in the custody of either party. We shall approach this review with an open mind and will not adhere to an abuse of discretion standard. Simply stated, our broad scope of review encompasses but is not limited to the narrow scope of review described by the term abuse of discretion. *Commonwealth ex rel. Berman v. Berman,* 289 Pa.Super. 91, 432 A.2d 1066 (1981). To reason in any other manner contradicts the very essence of our standard of review in custody cases. *In re Jennifer Lynn Arnold, Appeal of Merrill S. Arnold,* 286 Pa.Super. 171, 176, 428 A.2d 627, 629 (1981) (HOFFMAN, J., Concurring Opinion); *Commonwealth ex rel. E. H. T. v. R. E. T.,* 285 Pa.Super. 444, 458, 427 A.2d 1370, 1376 (1981) (HOFFMAN, J., Concurring Opinion).[1]

---

1. In *Commonwealth ex rel. E. H. T. v. R. E. T.,* supra, 285 Pa.Super. at 448, 427 A.2d at 1371–1372, we said:

   It is axiomatic that the singular concern in a custody proceeding is the best interest and welfare of the children involved. See *Wenger v. Wenger,* 267 Pa.Super. 134, 406 A.2d 555 (1979). To ensure that proper attention is addressed to this concern, we are obligated to exercise the broadest scope of review whenever a custody matter is before us on appeal. *Commonwealth ex rel. Drum v. Drum,* 263 Pa.Super. 248, 251, 397 A.2d 1192, 1193 (1979). Nonetheless, since the trial judge is in the best position to evaluate the attitudes, sincerity, credibility, and demeanor of the witnesses involved, his "determination of custody should be accorded great weight." *Commonwealth ex rel. Rainford v. Cirillo,* 222 Pa.Super. 591, 597–98, 296 A.2d 838, 841 (1972) (citation omitted). See, e.g., *Trefsgar v. Trefsgar,* 261 Pa.Super. 1, 395 A.2d 273 (1973); *Commonwealth ex rel. Zeedick v. Zeedick,* 213 Pa.Super. 114, 117, 245 A.2d 663, 665 (1968). Thus, although we are not duty bound to accept the trial court's determination, we will defer to it, absent an abuse of discretion, if the judge has thoroughly investigated the facts, that

■ It is axiomatic that the pole star of a custody dispute between the mother and father is what is in the best interest of the children involved. *Dena Lynn F. v. Harvey H. F.*, 278 Pa.Super. 95, 419 A.2d 1374 (1980); *Wenger v. Wenger*, 267 Pa.Super. 134, 406 A.2d 555 (1979). This interest encompasses their spiritual, emotional, physical and intellectual well being, *In re Jennifer Lynn Arnold, Appeal of Merrill S. Arnold*, supra, 286 Pa.Super. at 174, 428 A.2d at 628.

May L. H. and Robert H. H. separated in February of 1980 and were divorced on May 20, 1980. May L. H. moved from the family house. The children, after the separation, lived with their mother. Shortly after May L. H. moved from the family residence to a new dwelling, she established a sexual relationship with a man who lived with her and her children for several months. Some time later, she had a sexual encounter with a second man and yet later she moved from her dwelling to live with another man with whom she and her children resided through the time when the custody hearing was held.

Robert H. H. filed a petition for visitation (partial custody in fact) and a hearing on that petition was held on July 3,

investigation is documented by a complete record, and a comprehensive analysis of the judge's findings is contained in a written opinion. *Commonwealth ex rel. Rainford v. Cirillo*, 222 Pa.Super. at 597–98, 296 A.2d at 841. See *Commonwealth ex rel. Schwarz v. Schwarz*, 252 Pa.Super. 95, 380 A.2d 1299 (1977). Instantly the trial judge has complied with this formula and thus deference to his determination is warranted.

We find it very difficult to reconcile our very broad review of custody disputes with an abuse of discretion standard. The standard in custody disputes has been significantly watered down by the language:

Thus, although we are not duty bound to accept the trial court's determination, we will defer to it, absent an abuse of discretion, if the judge has thoroughly investigated the facts, that investigation is documented by a complete record, and a comprehensive analysis of the judge's findings is contained in a written opinion.

Id., 285 Pa.Super. at 448, 427 A.2d at 1371. We cannot determine whether the facts have been "thoroughly investigated," and "documented by a complete record" without engaging in an independent and comprehensive review of the record. Thus, we hold that our broad scope of review is not constrained by an "abuse of discretion" standard. We hold that any other reasoning is inherently contradictory.

1980 and a schedule for partial custody was established. On October 29, 1980, a hearing was held on a petition for habeas corpus which was filed by Robert H. H. On November 21, 1980, the trial court awarded custody to Robert H. H. This appeal followed.

A helpful review of Pennsylvania decisions involving custody disputes where the custodial parent has engaged in or is engaging in non-marital sexual relations is found in *Commonwealth ex rel. Grimes v. Grimes*, 281 Pa.Super. 484, 498–499, 422 A.2d 572, 579–580 (1980) (SPAETH, J., Dissenting Opinion):

Everyone develops a code of personal conduct. It does not follow that one is entitled to impose that code on others, or penalize those who do not conform to it. Especially in a child custody case is it important that the hearing judge distinguish between his personal code of conduct, and his determination of what is in the children's best interest. One may believe, with the utmost conviction, that certain conduct is wrong, and yet it may be that that belief should have little or no part in determining who should have custody of the children. A judge may believe that "lips that touch liquor shall never touch mine," but he is not for that reason to deny custody to a mother who drinks. A judge may be a devout churchgoer, but he is not for that reason to deny custody to a mother who does not go to church. Or, as here, a judge may believe that it is immoral for an unmarried woman to have sexual intercourse, but he is not for that reason to deny her custody of her children. See *Commonwealth ex rel. Myers v. Myers*, 468 Pa. 134, 360 A.2d 587 (1976) (collecting and discussing cases); *Gunter v. Gunter*, 240 Pa.Super. 382, 361 A.2d 307 (1976). Of course, "a parent's nonmarital relationships must be given close scrutiny in determining custody matters." *Commonwealth ex rel. Myers v. Myers*, supra, 468 Pa. at 138, 360 A.2d at 589. The purpose of the scrutiny, however, is only to determine the impact of the relationship on the children:

[I]t is the effect of the nonmarital relationship on the child and not the fact of the relationship itself which is crucial to a custody decision. If the evidence shows that a parent's conduct has had harmful effects on the child the court may be justified in denying custody to that parent. *On the other hand, if the evidence shows that the parent's conduct has not adversely affected the child and that the parent has taken good care of the child, then the best interest of the child may dictate that the parent retain custody.* In each case, all relevant circumstances must be examined to determine what action would be in the best interest of the child. *Commonwealth ex rel. Myers v. Myers,* supra, 468 Pa. at 141, 360 A.2d at 590.

The controlling words in this statement of the law are, "if the evidence shows . . . . " The court must never assume, or infer, that simply because a nonmarital relationship exists, the impact of the relationship on the children has been harmful. The evidence must show that it has been harmful, and this is so whether the nonmarital relationship, as in *Myers* and *Gunter,* approaches a *de facto* marriage or, as in this case, is more transient. *Rupp v. Rupp,* 268 Pa.Super. 467, 408 A.2d 883 (1979). *See also Commonwealth ex rel. Drum v. Drum,* 263 Pa.Super. 248, 397 A.2d 1192 (1979) (SPAETH, J., dissenting opinion).

(Emphasis added.)

■ The trial court in the instant case based its decision entirely upon the existence of three relationships which May L. H. had had with men since she was separated. The court's opinion concluded:

The children are at an impressionable age, the mother has had several triffling (sic) relationships with men who have moved into their residence and shared her bedroom on a regular basis up to and including the date of the hearing in this matter. Her conduct is sexually promiscuous, flagrant, persistant (sic) and immoral. Respondent's

conduct sets a bad example for the children. [Citation omitted.]

(Trial court's opinion at page three.)

Our review of the record finds that May L. H. established a sexual relationship with Bradley L. shortly after moving from her marital residence. This relationship lasted approximately four months. May L. H. and Bradley L. lived in the same house with the two children openly, however, there is little evidence in the record which would indicate that the children were ever exposed to any sexual intimacies which existed between May L. H. and Bradley L. The children always slept in a separate room while Bradley L. was in the residence. Furthermore, if the couple ever went out for an evening, baby-sitters were employed. The record does indicate that on one occasion the children told their father that they had gone swimming with their mother and Bradley and that their mother swam with her "top off." [2]

> The girls told me when I picked them up Labor Day—that was my holiday to get them—they were swimming either Saturday or Sunday night in the pool and they had their suits off and Kimberly told me she took her top off.
>
> Q. By "she" meaning who?
>
> A. May.

The record also indicates there was some drinking of beer in front of the children. However, it is clear that the drinking neither resulted in the children being abused nor was the drinking engaged in in front of the children frequently.[3]

The record indicates that the children had a warm relationship with Bradley L. There is no indication that the

---

**2.** The questioning which preceded this answer was objected to on hearsay grounds. The appellant has not questioned the admissibility of the evidence on appeal. Thus, we do not reach the issue of its admissibility, but note that the evidence is of questionable reliability.

**3.** The record also discloses that Bradley L. was younger than May L. H. and that he had received special education. However, he was an adult and the record does not indicate that his intellectual capacity is so deficient as to in any way indicate that the relationship would present so demonstrably peculiar a relationship to the children as to detrimentally affect them.

children were harmed by his presence. May L. H.'s landlord testified that she got to know Bradley L. and May L. H. and the children, and that they seemed very happy together.

Sometime after the departure of Bradley L. from the home that May L. H. engaged in a sexual relationship with a young married man. May L. H. stated she did not know he was married at the time and furthermore that the children were in no way exposed to this relationship. The record supports the appellant's contentions that the children were not in any way harmed by this relationship.

The third relationship into which May L. H. entered occurred several weeks later. This relationship was with a Lloyd S. May L. H. and the children moved from their home to reside with him. The relationship continued through the time of the hearing at which custody was awarded Robert H. H. There is testimony that Lloyd S. is or at least was at some time during the relationship with May L. H. a married man. There is, however, no indication that the children were aware of his marital status and there is clearly no indication that they were harmed by the mere existence of his marital status.[4]

The residence in which Lloyd S. lived with May L. H. and the two children was also inhabited by Lloyd S.'s son. It is clear, however, that the two girls slept in a room entirely separate from that of Lloyd S.'s son and that May L. H. and Lloyd S. slept in yet another separate room.[5]

There is evidence that the children have developed a happy and stable relationship with Lloyd S. They seek his assistance in the preparation of their homework. Testimony was given by a school counselor who indicated that since the children have been in the school district where Lloyd S.'s

4. The record indicates that Lloyd S. had been married three times. His final marriage was very, very short lived and he believed that when his relationship with May L. H. began it had been annulled.

5. The record discloses also that Lloyd S. has two daughters who are in his custody periodically, on weekends. They slept in yet another room and their relationship with Kimberly and Jessica is described as very amicable.

home is located, that the children have shown noticeable improvement scholastically and socially. The counselor stated:

If I may add something, the very first day that Kimberly was there she was somewhat tense and appeared to be quite shy, very nervous and many kids are that way in a new school situation, but Kimberly has blossomed. You can see it on a day to day daily basis and her teacher and other people have seen she has blossomed and it is an awfully good thing to see in a child, not only they are doing well academically but in all other areas, too, and we have seen this so much in Kimberly.

Testimony was given that May L. H. and Lloyd S. are attentive to the children and that in the event that they leave the children in the house that a baby-sitter is provided.

The only evidence involving any dispute to which the children were exposed, involving Lloyd S., all had their origin in the thorny relationship between May L. H. and Robert H. H. On several occasions when May L. H. did not believe her children should be with their father Lloyd S. became involved in disputes with Robert H. H. However, we note that his involvement in no way created or exaggerated the problems, rather, the difficulties were caused by the inharmonious relationship between the children's parents.

There is considerable evidence regarding May L. H.'s social activity in various taverns, and hotels. However, at no time is there any evidence which indicates that since her separation from her husband that her social activities resulted in her neglecting her children. In fact, she conscientiously arranged for their care while she was out of the home. Furthermore, there is no evidence that the children were cognizant of the substance of their mother's social activity outside her home.

While the record discloses that May L. H. was once overheard by a neighbor, who resided immediately next door

to her and her husband, swearing at her daughters, May L. H. denies these allegations. The record indicates clearly that the incident if it existed at all was a relatively isolated event. There is no evidence of any swearing or other abusive language expressed in the children's presence while in the custody of their mother.

The record viewed in its entirety contains countless sexual innuendoes by Robert H. H. and his family members regarding May L. H.'s life style, however, very little substance regarding the detriment the children supposedly were subjected to by their mother's social behavior.

The trial court apparently hinged its decision upon its view of the entire record, from which it concluded that the children were being raised in an environment in which they were surrounded by immorality and that the children were likely to learn from this experience and engage in immoral behavior themselves. We do not believe the record supports this contention. The children did witness their mother express affection for two men after separating from their father. They were never subjected to any abuse. They were never neglected. At most they were confronted with their mother's desire to experience relationships with men after her relationship with their father had ended. We are unwilling to hold that her behavior was so offensive as to impose upon her children an environment so steeped, in what one may be viewed as immorality, that she should have custody of her children denied her.

Accordingly, we hold that the record does not support the decision of the trial court. We have determined that the best interest of the children will be served by placing them in the custody of their mother. We reverse and remand to the trial court and direct that the trial court enter an order in accordance with this opinion and to establish a schedule of partial custody for Robert H. H. which is suited to the present circumstances of the parties and the children so as to return the children to the status quo ante.