298 Pa. Superior Ct. 428 (1982)
444 A.2d 1251
IN re CUSTODY OF J.S.S.
Appeal of A.S.
SANDRA J.S.
v.
ALVERTA S.
Superior Court of Pennsylvania.
Argued January 19, 1982.
Filed April 23, 1982.
*429 Charles James Fonzone, Allentown, for appellant.
John J. Keller, Allentown, did not file a brief on behalf of Sandra S., participating party at No. 1794 and for appellee at No. 1795.
Before JOHNSON, WATKINS and LIPEZ, JJ.
JOHNSON, Judge:
This is an appeal from an order of the Court of Common Pleas awarding custody of Jeremy S. to Sandra S. who is his grandmother.[1] The appellant, Alverta S., is the great-grandmother *430 of the child. The child's mother was killed in a car crash in May 1980 when the child was less than one year old.
The facts of this case are as follows. The child's mother, Debra, conceived the child in 1978 when she was sixteen years old, still in high school and living with her mother, Sandra. There was testimony that Sandra urged Debra to abort the pregnancy. Debra did not wish to do so, and moved to her grandmother Alverta's house where she lived until her accidental death in 1980. Her baby, Jeremy, the child whose custody is at issue in this case, has therefore lived with Alverta, his great-grandmother, since his birth in May 1979.
At the time of the hearing in October 1980, Sandra was 36 years old. She was living with her 17 year old son and 49 year old paramour in a second floor apartment. She is the eldest daughter of Alverta. She has worked in house-keeping at nursing homes since leaving her mother's home. Her two children, Debra and Willard, were born of a liaison with a married man, since deceased. She has lived with her paramour, Roger, for four and one half years, and been involved with him for about nine years.
Of Roger we know only that he has not been employed for about eight years. There was conflicting testimony as to his views about child-rearing and as to his relationship with Sandra's son, Willard. Of Willard all we know is that he is in eleventh grade and plays football.
Alverta is 55 years old. She owns a large house with a large yard. She was raised by maternal grandparents, married at 18 and gave birth to nine children before her husband died. She has never worked outside the home. Currently the adults in her household give her their paychecks, with which she manages the household. The household consists of about a dozen people of different generations and includes two of Alverta's daughters, a daughter-in-law, and their respective children of grade school age. The only men *431 are Harold Whelan, the 38 year old son of Alverta's former paramour, and a nephew of Harold who is 22. Harold appears himself to have had a sexual relationship with Alverta in the past. Harold works as a garage mechanic and also helps to maintain the house of which he is a part owner together with Alverta and two of her daughters. Harold testified, as did other members or former members of the household, that Jeremy is loved and well taken care of in Alverta's household.[2]
The judge awarded custody to Sandra essentially (1) because he was "concerned with the large number of people residing with Alverta", (2) because he was "concerned with exposing the child to the open sexuality of the Alverta S. household" and (3) because of the lack of "any type of steady relationship among men and women" in Alverta's household as compared to Sandra's. See slip op. at 5-6, Nos. 80-C-1955 & 80-C-2027 (C.P. Lehigh County, June 18, 1981).
In custody cases the scope of our review is very broad. Commonwealth ex rel. Spriggs v. Carson, 470 Pa. 290, 368 A.2d 635 (1977); Commonwealth ex rel. Oxenreider v. Oxenreider, 290 Pa.Super. 63, 434 A.2d 130 (1981). We do not usurp the fact-finding function of the trial court, but we are not bound by the deductions or inferences made by the trial judge from the facts he has found. We need not accept a finding which has no competent evidence to support it, but are instead required to make an independent judgment based on the evidence and testimony, and make such order on the merits of the case as to do right and justice. See Garrity v. Garrity, 268 Pa.Super. 217, 407 A.2d 1323 (1979), and cases cited therein. So as to facilitate this broad review, we consistently emphasize that the hearing court must provide us with a complete record and a comprehensive opinion which contains a thorough analysis of the record and *432 specific reasons for the court's ultimate decision. Garrity v. Garrity, supra; Guelich v. Guelich, 282 Pa.Super. 621, 425 A.2d 848 (1980). When the hearing judge fully complies with these requirements, his decision is not reversed unless he has abused his discretion. Commonwealth ex rel. Bendrick v. White, 403 Pa. 55, 169 A.2d 69 (1961); Commonwealth ex rel. E.H.T. v. R.E.T., 285 Pa.Super. 444, 427 A.2d 1370 (1981).[3]
In custody cases the best interests of the child are the most important consideration. All other considerations are deemed subordinate to the child's physical, intellectual, emotional, moral and spiritual well-being. See Commonwealth ex rel. Holschuh v. Holland-Moritz, 448 Pa. 437, 444, 292 A.2d 380, 383 (1972); In re Snellgrose, 432 Pa. 158, 163, 165, 247 A.2d 596, 599, 601 (1968); Jon M.W. v. Brenda K., 279 Pa. Super. 50, 54, 420 A.2d 738, 740 (1980); Commonwealth ex rel. Williams v. Williams, 229 Pa.Super. 327, 330, 324 A.2d 540, 542 (1974); Commonwealth v. Kraus, 185 Pa.Super. 167, 170, 138 A.2d 225, 227 (1958). To affirm the order of the lower court, therefore, we must be persuaded that its decision comports with the best interests of the child. Additionally, each party has the burden of proving that the best interests of the child will be served by the placement of the child with her. Beichner v. Beichner, 294 Pa.Super. 36, 439 A.2d 737 (1982).
For the reasons given below, we find that Sandra did not meet this burden, that the record is inadequate, that the lower court's opinion did not sufficiently consider and analyze all the testimony, and that the lower court drew conclusions that are either not based on, or are controverted by, the testimony.
These defects are all intertwined. We shall therefore discuss them in terms firstly of the insufficient information in the record, which bears on the judge's having reached *433 conclusions which had no facts to support them, and secondly in terms of what is in the record which the judge did not treat in his opinion or seemed to disregard in making his decision.
In Hugo v. Hugo, 288 Pa.Super. 1, 430 A.2d 1183 (1981), we remanded the case for more detailed findings of fact and a more comprehensive opinion. One of the deficiencies which we noted in Hugo was that the husband of the person to whom custody was awarded by the trial court was not present when the social worker visited the home, nor did he testify at the custody hearing. We decided that without more information about the relationship between the child and the man in question, the lower court had an insufficient basis for its conclusion that the home was suitable. Id., 288 Pa.Superior Ct. at 7, 430 A.2d at 1186.
The same defect exists here. We know from the record that at the time of the hearing Sandra had lived with Roger for about four years, and that he had not worked for eight years. Sandra testified that on the day of the hearing he was visiting his mother who was sick, and yet that he did want Sandra to have Jeremy. Similarly, Sandra's son Willard, though not in school on the day of the hearing, did not attend the hearing. Nor was Willard ever interviewed by the case worker.[4] We cannot affirm an award of custody to a family unit where two-thirds of that unit are not seen or examined before the court, or where there is no adequate competent testimony about them presented to the court, so that the court may make a well-founded decision.
Additionally, in Hugo this court noted that the social worker visited the home of the mother and "was able to comment on the child's surroundings and interaction with *434 his mother." Id. This element was absent in the case before us now. The case worker did not, on her single visit to Sandra's home, observe any interaction between Sandra and Jeremy.[5] We find this to be a substantial defect.
In Beichner v. Beichner, 294 Pa.Super. 36, 439 A.2d 737 (1982), in Jones v. Floyd, 276 Pa.Super. 76, 419 A.2d 102 (1980), and in Gunter v. Gunter, 240 Pa. Super. 382, 361 A.2d 307 (1976), we reversed and remanded when the record lacked, inter alia, disinterested testimony from a social worker, pastor or psychologist about the parties. In this case the only witnesses for Sandra at the first hearing were her landlady, who testified that Sandra's apartment was always clean, and the owner of a day care center who testified about the program at the center where Sandra said she would place Jeremy during the day. The latter person testified that she did not know Sandra and did not know how Sandra would discipline Jeremy. The witnesses for Alverta consisted of family members and a neighbor. These testified to Jeremy's being loved and well cared for. The trial court, after the hearing, ordered an investigation to be made by the Lehigh County Department of Children and Youth Services, with costs to be shared by Alverta and Sandra. A caseworker from Pinebrook Services for Children and Youth in Allentown did the court-ordered study of Alverta's and Sandra's households on behalf of the Lehigh County agency. (See Brief for Appellant at 5.) She testified at the second hearing. The facts supplied in both her testimony and her report chiefly concerned the living arrangements of each household and the family history of the parties.
Although the case worker's report arguably satisfies the letter of the Beichner and Floyd requirement, it does not satisfy the spirit. It lacks any basic information about the atmosphere of Sandra's household and how Jeremy would adapt to it, and it lacks any information about the relationship *435 between Sandra and Jeremy. Instead it contains conclusions which were shown on cross-examination not to be based on fact. For example, with reference to her conclusion, adopted by the court, that the atmosphere in Alverta's household was one of open sexuality because women who entertained men had double beds, the testimony on cross-examination was as follows:
A. When we were going through the home and looking at the rooms, she indicated to me that Jean had a single bed and was sleeping in the same room as two of her children, and indicated that she was no longer interested in men.
Q. And that's how you translate that into what you've typewritten?
A. And also that Barbara had a boy friend and she was the only female in the home that had a room to herself and a double bed.
Q. And did she tell you all of this at one time?
A. In the course of the conversation while touring the house, yes.
Q. And how long was that conversation?
A. While touring the house. I would say it took us approximately fifteen minutes to tour the house.
Q. And do you recall specifically when she told you those two separate facts?
A. We went to the two bedrooms, one right after the other, so it would have been in that period of time.
Q. And she told you basically what?
A. That Jean had a single bed and was sleeping in the room with two of her children because she was no longer interested in men, and indicated that Barbara had a double bed and she was seeing someone.
Q. And did she tell you that's why she had a double bed?
A. I can't say that she actually said that's why she had a double bed, no.
Q. But you agree that your typewritten statement would indicate that?

*436 A. She alluded to the fact, yes, and that's what's in my report.
Q. Well, there's no allusion at all in your typewritten statement. You say, "Barbara, for example, has private room and double bed because she is presently dating someone."
A. Yes.
Q. And is your recollection clear then that it was that matter of factly said to you, or is that a conclusion you arrived at?
A. She did present the two facts one right after the other.
Q. And your fertile imagination put them together?
MR. KELLER: Objection.
THE COURT: The objection is overruled.
BY MR. FONZONE:
Q. You may answer.
A. Well, since she stated the two facts one right after the other, yes, I put them together.
Despite this testimony, the trial court adopted the conclusion of "open sexuality" as well as the caseworker's unsubstantiated conclusion that the house was "overcrowded" with people who had "undefined roles."
The record shows that the lower court's opinion and order were dated June 18, 1981. Notice of appeal was filed on July 9, 1981. On June 25, Alverta's counsel submitted a petition to the trial judge for reconsideration of the order because of previously unavailable evidence in the form of the opinion of Jeremy's physician that placing Jeremy with Sandra would be against Jeremy's best interests. This petition was denied on July 6, 1981. On June 29, the physician in question wrote a long and detailed letter to the judge expressing, with reasons, his dismay at the custody order. (This letter was filed on July 31 and is part of the record.) Although we fail to see why counsel did not inform himself as to the possibility of the availability of this testimony before the hearing, we do not condone the trial judge's *437 summary denial of the petition, particularly in view of the information, observations and opinions presented to him by the physician and of his responsibility to assure himself that his decision be in Jeremy's best interest. On remand, this error should be corrected.
Thus, although in this case there was ostensibly some evidence from a disinterested witness, this evidence was inadequate. On remand more information should be made available to the court in the form of testimony, expert or otherwise, with regard to the relationship between Jeremy and the people in the Alverta's household and between Jeremy and those in Sandra's household. See Commonwealth ex rel. Michael R. v. Robert R.R., 293 Pa.Super. 18, 437 A.2d 969 (1981), where we noted, inter alia, the absence of any analysis of the effect of the mother's relationship with her new paramour on the children; Gunter v. Gunter, supra, where we remarked on the absence of testimony about the mother's relationship with her paramour.
One of the most important elements for consideration in custody cases is continuity of the child's environment. In Commonwealth ex rel. Children's Aid Society v. Gard, 362 Pa. 85, 66 A.2d 300 (1949), our Supreme Court awarded custody of a four-year-old to her foster parents. The court said:
A child of two years of age or under will form new attachments quickly if treated kindly by those into whose care it is given. In that respect it resembles a young tree whose roots have not yet taken deep hold in the nourishing earth, but when a child is much beyond the age of two years, it becomes strongly attached to those who stand in parental relationship to it and who have tenderly cared for it. Its bonds of affection have become so strong that to sunder them suddenly may result not only in the child's unhappiness, but also in its physical injury. * * * Nothing could be more cruel than the forceable separation of a child from either its real or foster parents by whom it has been lovingly cared for and to whom it is bound by strong ties of affection.
*438 362 Pa. at 97, 66 A.2d at 306. See also In Interest of Tremayne Quame Idress R., 286 Pa.Super. 479, 429 A.2d 40 (1981); Pamela J.K. v. Roger D.J., 277 Pa.Super. 579, 419 A.2d 1301 (1980); Gunter v. Gunter, supra.
The trial court in placing Jeremy with Sandra gave no consideration whatsoever in its opinion to the fact that it was uprooting this young child from the home he had lived in since birth. This was error, and should be corrected on remand. See e.g., Ray v. Ray, 293 Pa.Super. 216, 438 A.2d 614 (1981), where one of the factors to be included in a hearing after remand was the effect on the children of a change in custody.
In addition to a complete record we also need a comprehensive opinion which shows a searching and thorough analysis of all the testimony, and conscientious and independent reasoning. See, e.g., Ray v. Ray, 293 Pa.Super. 216, 438 A.2d 614 (1981) (remanded for additional evidence, including the current living conditions of each party and the effect on the children of a change in custody, and for a comprehensive and analytical opinion addressing the fitness of the parties, the credibility of the witnesses, the home surroundings of the parties and the care and condition of the children). See also Commonwealth ex rel Michael R. v. Robert R., 293 Pa.Super. 18, 437 A.2d 969 (1981); Hugo v. Hugo, 288 Pa.Super. 1, 430 A.2d 1183 (1981); In re Custody of White, 270 Pa.Super. 165, 411 A.2d 231 (1979); Gunter v. Gunter, 240 Pa.Super. 382, 361 A.2d 307 (1976).
In its opinion the trial court discusses the physical arrangements of the two households, and finds that both are equally clean. He decides, however, that Alverta's house is overcrowded. This conclusion had been reached by the case worker in her report. On cross-examination she admitted that were the house twice as large she would still find it objectionable. The judge stated further that Jeremy would "receive much more individual attention and guidance" in Sandra's home. This shows a disregard for the fact that in Alverta's home he would be with Alverta during the day and in Sandra's home he would be at a day care center all day. *439 We do not see "more individual attention and guidance" forthcoming in Sandra's home based on these facts.
The origin of the judge's view of the "open sexuality" of Alverta's household is discussed supra at pp. 1254-1255. We would add at this point, however, some words by Judge SPAETH dissenting in Commonwealth ex rel. Grimes v. Grimes, 281 Pa.Super. 484, 422 A.2d 572 (1980), which are quoted by Judge BROSKY in Robert H.H. v. May L.H., 293 Pa.Super. 431, 436, 439 A.2d 187, 190 (1981):
Everyone develops a code of personal conduct. It does not follow that one is entitled to impose that code on others, or penalize those who do not conform to it. Especially in a child custody case is it important that the hearing judge distinguish between his personal code of conduct, and his determination of what is in the children's best interest. One may believe, with the utmost conviction, that certain conduct is wrong, and yet it may be that that belief should have little or no part in determining who should have custody of the children. A judge may believe that "lips that touch liquor shall never touch mine," but he is not for that reason to deny custody to a mother who drinks. A judge may be a devout churchgoer, but he is not for that reason to deny custody to a mother who does not go to church. Or . . . a judge may believe that it is immoral for an unmarried woman to have sexual intercourse, but he is not for that reason to deny her custody of her children.
Commonwealth ex rel. Grimes v. Grimes, 281 Pa.Super. at 498, 422 A.2d at 579. From the trial court's opinion, relying heavily on the caseworker's report and testimony and ignoring almost entirely the rest of the testimony at trial, we are not convinced that the trial court overcame the hurdle of his disapproval of Alverta's household in order to consider where Jeremy would be happier and more loved and better cared for. The judge's view that privacy for those who have boyfriends is a "reward for promiscuity" is not the only inference to be drawn, nor is it based on anything but the caseworker's opinion. See pp. 1254-1255, supra.
*440 The judge's next conclusion was that Jeremy would be harmed by growing up in Alverta's household where there was no "steady relationship between men and women." We understand the judge's view that an ideal situation may be to grow up under the umbrella of such a relationship. The judge assumes that the relationship between Roger and Sandra is such a relationship, from the mere fact that they have lived together for a number of years. But from the record that is the only fact that is shown. There is testimony that Roger and Willard's son do not get along. And although there are no married couples in Alverta's household there is no evidence that there is not a loving, warm, contented atmosphere there. The judge's conclusion is based on the bare fact that Roger lives with and is supported by Sandra. He sees a "strong family structure" in Sandra's household and ignores what appears to be the closely-knit family structure of Alverta's household. As we said in Gunter, "[p]erhaps the . . . home is more stable, but the record does not show that it is." 240 Pa.Super. at 397, 361 A.2d at 315.
The judge also concluded that Jeremy's sense of security would be harmed by the number of adults supervising and disciplining him. "For a young child to be secure, he must have only a limited number of authority figures and one distinct set of guidelines for him to master. With so many authorities [as there are in Alverta's household], the child may never be quite sure what is expected of him and his sense of self will be harmed." This conclusion again was inspired by the caseworker's report, and assumes that the various adults in Alverta's household all have different rules and expectations, and that those in Sandra's have the same. The record does not provide a basis for these assumptions.
In custody cases, we have on occasion held that the child should be represented by counsel. See Act of July 9, 1976, P.L. 586, No. 142 § 2, 42 Pa.C.S.A. § 6337, which provides that in juvenile proceedings a child should be represented by counsel if the child's interests are in conflict with another party's interests. In Stapleton v. Dauphin County Child *441 Care Service, 228 Pa.Super. 371, 324 A.2d 562 (1974), allocatur denied, January 6, 1975, we reversed and remanded directing the court below to appoint counsel for the child and to conduct a new hearing. See also In Re Davis, 288 Pa.Super. 453, 432 A.2d 600 (1981), petition for allowance of appeal granted, October 16, 1981; In Interest of Clouse, 244 Pa.Super. 396, 368 A.2d 780 (1976), petition for allowance of appeal denied, May 16, 1977. In Commonwealth ex rel. Grimes v. Yack, 289 Pa.Super. 495, 433 A.2d 1363 (1981), petition for allowance of appeal denied, October 26, 1981, this court held that it was not an abuse of discretion for the lower court to have refused to appoint counsel for the child, and declined to remand for the appointment of counsel in order not to prolong the litigation. Id., 289 Pa.Superior Ct. at 518, 433 A.2d at 1375. Here, we raise the issue, but leave it to the lower court's discretion on remand to determine whether the appointment of separate counsel to represent Jeremy would better insure the best interests of the infant child.
The order awarding custody of Jeremy S. to Sandra S. is reversed. The case is remanded for further proceedings consistent with this opinion.
NOTES
[1] Two separate petitions were filed below and then consolidated. One was a petition by appellant for confirmation of custody in her and the other was a petition by appellee for a writ of habeas corpus. Alverta's custody petition was filed on June 17, 1980, as was the Rule to Show Cause. The sheriff's return shows that service was made on Sandra at 5:00 p.m. on June 18, 1980. Sandra's petition for habeas corpus was acknowledged by her on June 19, 1980 and filed on June 30, 1980. In that petition Sandra averred at ¶ 14 that she had no "information of any custody proceeding concerning the said child in any court of Pennsylvania or any other state." This statement is inconsistent with the facts revealed by the record. It is unclear to this court why the habeas corpus petition was filed, in view of the petitioner's record knowledge of the custody petition and in view of the fact that the issues in both petitions are the same.
[2] The putative father of the child also testified that he "would like to see the great grandmother get the child. If not, [he] would like it. . . . Because she raised it . . . and she took care of that child very well." N.T. at 61.
[3] Compare R.H.H. v. May L.H., 293 Pa. Super. 431, 439 A.2d 187 (1981); Berman v. Berman, 289 Pa. Super. 91, 432 A.2d 1066 (1981). In these cases the abuse of discretion standard is criticized.
[4] The reason given by the caseworker for her not interviewing the son was that as he was 17 years old he would soon be leaving home, and so it was not necessary for him to be present for the home study. This assumption made by the caseworker is typical of her attitude towards the case. She appeared incapable of overcoming a bias against Alverta's household. Her report and her testimony are replete with conclusions such as this which she drew without evidence to support them.
[5] It is apparent from the record that Jeremy has in fact spent very little time with Sandra since his birth. Since Debra's death it appears that Jeremy had visited twice with Sandra, and that Sandra had visited him once at Alverta's house.