**Jana HICKS, Appellant,**

v.

**David HICKS, Appellee.**

Superior Court of Pennsylvania.

Argued Oct. 27, 2004.

Filed Feb. 14, 2005.

Stephen J. Mirizio, Sharon, for appellant.

Joann M. Jofery, Sharon, for appellee.

BEFORE: BENDER, PANELLA and POPOVICH, JJ.

OPINION BY POPOVICH, J.:

¶ 1 Appellant Jana Hicks appeals the order of the Court of Common Pleas of Mercer County denying her the right to baptize her minor child ("M.H.") without the consent of the natural father, Appellee David Hicks. We reverse.

¶ 2 The facts of record disclose that the parties were married on June 13, 1987, and one child was born of the marriage (M.H., D.O.B. 8/29/95). Even though Appellant was baptized a Catholic, she acquiesced to Appellee's wishes and the two were married at the West Middlesex Presbyterian Church, West Middlesex, Pennsylvania. During a period in the marriage, the parties attended Pleasant Valley Evangelical Church in Niles, Ohio, and then they transferred to The First Assembly of God Church in Hermitage, Pennsylvania.

¶ 3 The parties were divorced from the bonds of matrimony on September 28, 1998, and, in conjunction therewith, a property settlement agreement was executed setting forth the custodial rights of the litigants. Appellant had primary physical custody of the parties' minor child, while Appellee had partial physical custody. This arrangement included Appellee's right to have the minor child every weekend from Friday to Sunday, and every other weekend from Sunday to Monday morning. While in Appellee's custody, the minor child attended The First Assembly of God Church. Additionally, the minor child attended religious classes at the First Assembly of God Church. While in Appellant's custody, the minor child attended religious services at a Roman Catholic church.

¶ 4 The custodial agreement was modified on April 27, 2003, by permitting the minor child to be with Appellee three out of four weekends, and the two continued to attend The First Assembly of God worship site. Appellee also enrolled M.H. in the church's Sunday school program. During the ensuing year, it came to Appellee's attention that Appellant intended to baptize the minor child in the Russian Orthodox faith sometime in early April 2004 in

Cleveland, Ohio. Appellee filed a "Motion For Special Relief" to enjoin the religious ceremony. The trial court issued an order enjoining Appellant from baptizing the minor child without the express written consent of the Appellee, and a rule was issued to show cause why this relief should not be made permanent. The rule was made returnable, and a hearing was held on April 1, 2004.

¶ 5 At the hearing, Appellee had no objection to his minor child, while in her mother's custody, attending Catholic or Russian Orthodox services. Likewise, Appellant espoused religious tolerance in allowing her daughter to attend Pentecostal/First Assembly of God services (Wednesday and Sunday) with her father. However, it appears that in October of 2001, Appellant and the minor child began attending St. Sergious Russian Orthodox Church in Parma, Ohio. Appellant denied her religious affiliation had changed because her fiancé was Russian Orthodox, and she intended marrying in the Russian Orthodox faith on May 16, 2004.

¶ 6 Appellant wanted her daughter to be baptized in the Russian Orthodox faith because this sacrament had not been administered while attending either Catholic or First Assembly of God services, which in the latter case would not have occurred while the child was "young." Appellee's associate pastor at The First Assembly of God Church attested that the preferred age (between 12 and 14) and cognizance of what the person was doing (accepting Christ as their Savior) were conditions precedent to administering baptism. N.T. Hearing, 4/1/04, at 22.

¶ 7 Appellee's objection was not to his daughter being baptized, be it in the Catholic, Pentecostal, or Russian Orthodox faith. Appellee phrased his position thusly:

This will be now the third religion introduced into [the minor child's] life, and her being baptized in the Orthodox Church, umm, I oppose that. I don't think that that should happen at this time. I think she should grow up, and at her age, when she's old enough, she can make her own decision.

*Id.* at 9. In contrast, Appellant painted a picture of her daughter as content with being assimilated into the Russian Orthodox religion, a faith which requires that one be baptized and then "chrismated" (anointed) before being "take[n by] them to their facility." *Id.* at 44.

¶ 8 The trial court, after listening to and observing the parties, concluded, "substantial harm would be caused to [M.H.] should [Appellant] be permitted to have her baptized in the Russian Orthodox [f]aith at this time. The harm would come from the significant increase [in] the level of stress between the parties should [Appellant] be permitted to do so at this time. [...] No good can come to any child placed into such an emotional situation." Trial court opinion, 6/8/04, at 4. Further, the trial court set 13 years of age as the point in time when M.H. could decide into which religion, if any, she wished to be baptized. *Id.* at 5. The choice would rest with M.H. and not her parents. This appeal followed questioning whether the trial court abused its discretion in prohibiting Appellant from baptizing the minor in the church of her choice, especially absent any evidence this would present a substantial threat of present or future physical or emotional harm to the minor child. *See* Appellant's brief, at 4.

¶ 9 The trial court repeatedly stated during the April 1, 2004, hearing that, despite religious overtones, the case revolved around the issue of legal custody. *See* N.T. Hearing, 4/1/04, at 5, 9–10 and 24.

¶ 10 It is well-established in Pennsylvania that custody and visitation matters are to be decided on the basis of

the judicially determined "best interests of the child" standard, on a case-by-case basis, considering all factors which legitimately have an effect upon the child's physical, intellectual, moral, and spiritual well-being. *Zummo v. Zummo,* 394 Pa.Super. 30, 574 A.2d 1130, 1142 (1990).

On appeal, our scope of review is broad in that we are not bound by deductions and inferences drawn by the trial court from the facts found, *nor are we required to accept findings which are wholly without support in the record.* On the other hand, our broad scope of review does not authorize us to nullify the fact[-]finding function of the trial court in order to substantiate our judgment for that of the trial court. Rather, *we are bound by findings supported in the record,* and may reject conclusions drawn by the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*Lee v. Fontine,* 406 Pa.Super. 487, 594 A.2d 724, 725 (1991) (emphasis added; citations omitted).

▉ ¶ 11 Great deference should be afforded the hearing judge, who is in a better position to assess the circumstances. *Siliquini v. Kegel–Siliquini,* 786 A.2d 275, 276 (Pa.Super.2001). However, we will not embrace a finding that is not supported, or is contradicted, by the record. *Id.* We must examine the evidence with an eye toward rendering an independent judgment which will insure that this Commonwealth's justifiable interest in the health and safety of its children are met. *Robert H.H. v. May L.H.,* 293 Pa.Super. 431, 439 A.2d 187, 188–89 (1981).

▉ ¶ 12 This case concerns whether Appellant may have her daughter baptized in the Russian Orthodox faith, despite objections from Appellee. The trial court found the evidence was sufficient to forestall Appellant's baptismal plans, believing

that "stress" levels would heighten between the natural parents, and overflow into the minor child's world, should precautionary measures not be implemented to curtail the religious event. The reasons for doing so, and the supportive measures implemented, were articulated by the trial court as follows:

It is clear to this Court after listening to and observing the parties testify that substantial harm would be caused [M.H.] should [Appellant] be permitted to have her baptized in the Russian Orthodox Faith at this time. The harm would come from the significant increase [in] the level of stress between the parties should [Appellant] be permitted to do so at this point in time.

While each party tolerates the other's religious choice, it is evident that each believes their chosen religion is the only true religion. The choice of which religion to have their daughter baptized into is viewed by the parties as a battle for the immortal soul of the child. Neither party appears willing to lose to the other party. This Court believes that if either party is permitted to prevail, the other party will attempt to erase the perceived victory. No good can come to any child placed into such an emotional situation.

Under these circumstances, a court can and should intervene. *Zummo v. Zummo, supra.*

The restriction is the least intrusive measure. It does not bar the child from being baptized, it merely requires both parties to agree on the religion. Each party can continue to take the child to their respective churches and indoctrinate her as they see fit.

This Court gave the child the right to decide at age 13 which, if any, religion into which she should be baptized for two reasons. The first is that neither party would perceive the other as a win-

ner because the child would be the one to have made the choice. Hence, the chances of an increase in stress between the parties as a result of the baptism would lessen. The second is that the child ultimately has a right to chose [*sic*] her own religion.

This Court concedes that the decision to use 13 as the age of choice is arbitrary to the extent tha[t] a decision to use any age under 18 can be deemed arbitrary. The issue is whether or not a 13 year old is mature enough to make a decision which religion he or she wishes to practice. This Court believes that 13 year olds, as a rule are mature enough to make that decision. That is the age when children start to separate from their parents. They are also normally old enough to understand the consequences of their decision.

Trial court opinion, 6/8/04, at 4–6. We disagree, and find the evidence is not as "clear" as the trial court states to necessitate implementing restrictions to impede Appellant's baptismal plans for her daughter.

The vast majority of courts addressing th[e] issue [of the deleterious effects, if any, of exposing children to a competing religion after grounding them in the tenets of an earlier religion] have concluded that each parent must be free to provide religious exposure and instruction, as that parent sees fit, during any and all periods of legal custody or visitation without restrictions, unless the challenged beliefs or conduct of the parent are demonstrated to present a substantial threat of present or future, physical or emotional harm to the child in absence of the proposed restriction.

\* \* \* \*

Applying this standard, courts have rejected speculation by parents and by experts as to potential future emotional harm to a *particular* child based upon

the assumption that such exposure is *generally* harmful. Likewise, parental attributions of current child disturbances or distress as the result of a religious conflict, rather than the divorce generally or other causes, have similarly been rejected.

We emphasize that this standard requires proof of a "substantial threat" rather than "some probability[.]" We also emphasize that while the harm involved may be *present or future* harm, the speculative possibility of mere disquietude, disorientation, or confusion arising from exposure to "contradictory" religions would be a patently insufficient "emotional harm" to justify encroachment by the government upon constitutional parental and religious rights of parents, even in the context of divorce.

For children of divorce in general, and children of intermarriage and divorce especially, exposure to parents' conflicting values, lifestyles, and religious beliefs may indeed cause doubts and stress. However, stress is not always harmful, nor is it always to be avoided and protected against. The key[ ] is not whether the child experiences stress, but whether the stress experienced is unproductively severe.

In *Fatemi v. Fatemi,* [339 Pa.Super. 590, 489 A.2d 798 (Pa.Super.1985)], Judge Beck cogently observed:

It is important for courts to impose restrictions sparingly. Courts ought not impose restrictions which unnecessarily shield children from the true nature of their parents unless it can be shown that some detrimental impact will flow form the specific behavior of the parent. The process of a child's maturation requires that they view and evaluate their parents in the bright light of reality. Children who learn their parents' weaknesses and

strengths may be able better to shape life-long relationships with them.

489 A.2d at 801. Assuming that the father's religion is or becomes a source of conflict between him and his children, it is nonetheless important that, absent unproductively severe conflict and distress, the father and the children be permitted to work through the conflict in developing their post-divorce parent-child relationships. Restrictions on this process may themselves generate stress from the artificial or incomplete nature of the parent-child exchange. For this reason too, restrictions must be imposed sparingly.

\* \* \* \*

What little empirical evidence exists regarding the generalized trauma or "marginality" of children of intermarriage presumed to result from their exposure to conflicting religions and/or conflicting value systems suggests an *absence* of generalized trauma and/or "marginality." Professor Egon Mayer has observed that his data:

> add up to an overall impression that the children of intermarriage do not feel any keen pangs of conflict or confusion about themselves, nor do they have fractured relationships with their parents and families. Marginality and all its associated psychological perils undoubtedly plague some, but most are unperturbed by their dual heritage.

\* \* \* \*

In a commentary addressed specifically to the issue of exposure of children to different religions in the context of divorce, Judith Petsonk and Jim Remsen conclude, "exposing a child to more than one religion in the various households to which [the child] is attached does not, by itself, cause [the child] emotional stress or identity confusion. [ . . . ] Other commentators have recommended exposure

to both religions in varying degrees, and have warned that suppression of a significant portion of a child's cultural/religious heritage may itself create a "time bomb" with potential for serious emotional harm in the future [ . . . ].

In sum, far from being established "beyond dispute," our research reveals there is no objective basis to support either parental or expert predictions of future harm to a *particular* child based upon an assumption that such exposure is *generally* harmful. The caselaw, commentaries, and empirical studies all suggest, if not compel, an opposite conclusion—that while some may suffer emotional distress from exposure to contradictory religions, most do not. Consequently, the *dictum* in *Morris[ v. Morris*, 271 Pa.Super. 19, 412 A.2d 139 (1979) ] suggesting a presumption of future harm from exposing a child to conflicting religions is expressly disavowed.

*Zummo*, 574 A.2d at 1154–57 (citations omitted; emphasis in original; footnote omitted).

¶ 13 Herein, we find the evidence wholly insufficient to meet the standard set forth in *Zummo, supra.* First, no "competent" evidence was proffered by Appellee substantiating a threat of present or future physical or emotional harm to the minor child should the baptismal ceremony be performed; to-wit:

*BY [ATTORNEY FOR APPELLEE]:*

Q[.] What's your specific objection [to M.H. being baptized in the Russian Orthodox Church,] sir?

[APPELLEE]:

A[.] This will be now the third religion introduced into her life, and her being baptized in the Orthodox church, umm, I oppose that. I don't think that that should happen at this time. I think she should grow up, and at her age, when

she's old enough, she can make her own decision.

\* \* \* \*

Q[.] [Appellee,] specifically then, your problem is with the baptism as Russian Orthodox, not her attending [the Russian Orthodox] church -

A[.] Correct.

\* \* \* \*

CROSS EXAMINATION

BY [ATTORNEY FOR APPELLANT]:

Q[.] Now, again. I want to be clear about this: You have no difficulty with the child going to the Orthodox church; correct?

A[.] When she's with her mother.

Q[.] Right. And you take your daughter to your church when she's with you?

A[.] Correct.

Q[.]. And she has some exposure to the Roman Catholic faith; correct?

A[.] Through the school.

Q[.] Through the school. And all of these, in developing your daughter, they're all Christian religions; whatever you may label it, it's all healthy and beneficial to the child. Would you agree with that? Would you agree with that, sir?

A[.] They're all Christian as far as I understand it.

Q[.] So it would all be healthy and beneficial to the religious well-being of this child; would you not agree?

A[.] I'm not sure.

\* \* \* \*

Q[.] *[Given your] unfamiliarity with the [Russian Orthodox] church or the religion? That's the objection?*

A[.] *The confusion of adding another one.*

Q[.] *The confusion to whom?*

A[.] *[M.H.]*

Q[.] *You feel that the child would be confused -*

A[.] *Yes.*

Q[.] *—if given another religion?*

A[.] *Yes.*

Q[.] *You're basing that opinion on what, sir?*

A[.] *Umm, my daughter's reaction to it and my reaction to it.*

Q[.] Your reaction to it? Have you seen—you're saying "yes"; is that correct? Your reaction to it?

A[.] I said my daughter's and my reaction.

Q[.] *Have you observed your daughter in the [Russian Orthodox] church?*

\* \* \* \*

A[.] *No, I have not.*

\* \* \* \*

Q[.] *So you're saying that, based upon your observations outside of these religious environments, it's your opinion that it wouldn't be helpful to the girl. Is that what you're saying?*

A[.] *Adding the third religion would not, in my opinion.*

Q[.] *In your opinion. All right.*

A[.] *That's what I feel.*

Q[.] *And you're particularly upset with the fact that this child would be baptized.*

A[.] *Yes.*

N.T. Hearing, 4/1/04, at 9, 11, 12–13 and 14–15 (emphasis added).

¶ 14 From the preceding, it is apparent Appellee's objection to his daughter's baptism is more a perceived harm (unsubstantiated opinion the Russian Orthodox faith would "confuse" the child) than one predicated upon a fact of "substantial harm" should the religious rite be performed.

¶ 15 The associate pastor (Michael Sabella) at Appellee's First Assembly of God

parish was no more enlightening on the elemental aspects of "substantial harm." Pastor Sabella testified to the frequency with which Appellee and his daughter attended Wednesday night and Sunday church services. The daughter exhibited no abnormal behavior when in his company, nor was there any mention that the cavalcade of religions was wearing thin on the minor child.

¶ 16 When Pastor Sabella was asked whether there was an ideal age at which a child should be baptized, he answered, "Umm, it's not necessarily an age situation." N.T. Hearing, 4/1/04, at 22. He further offered that, "a third grader [as is M.H.] is [absolutely] capable or competent to accept Christ and understand[.]" *Id.* at 27. But, he discounted the ability of an eight-year-old to "grasp" the concept of baptism, which symbolizes the birth, death, and burial of Jesus Christ. *Id.* at 22 and 28. This prompted Pastor Sabella to opine that, at this stage of her life, M.H. would not be eligible to be baptized in The First Assembly of God Church. *Id.* at 23. However, if M.H. were baptized in another religion in advance of The First Assembly of God Church, this preceding event would not foreclose her from being baptized in Appellee's faith. *Id.* at 24–25.

¶ 17 The last of three witnesses to testify, Appellant acknowledged being raised a Roman Catholic, being married in a Presbyterian church, and attending The First Assembly of God Church during marriage. After divorcing, Appellant and her daughter attended a Russian Orthodox Church for the last two and one-half to three years. This was the worship site selected for M.H.'s baptism. M.H. also took training classes in preparation for baptism, she was excited about being baptized, and she never indicated disenchantment with the prospects of participating in this sacramental rite. N.T. Hearing, 4/1/04, at 35. Appellant remarked her daughter had not suffered academically, socially, physically, or psychologically in preparing for baptism. *Id.* at 36–37.

¶ 18 In light of the aforesaid, we find speculative Appellee's assessment of "confusion" exhibited by his daughter, especially in the absence of her presence at the hearing or any psychological interview or evaluation to add credence or corroboration to his unsubstantiated, detrimental prognosis. We find such speculative diagnosis patently insufficient to satisfy the proof level ("substantial threat" rather than "some probability") sufficient to impose restrictions upon Appellant's baptismal plans for her daughter. *Zummo, supra.* Appellee initiated this injunctive procedure, but he fell short of satisfying his burden of substantial harm befalling his daughter should the baptismal ceremony go forward.

¶ 19 We find an absence of competent evidence that the belief of the party to be restricted presents a substantial threat of present or future physical or emotional harm to the minor child. It is quite the leap of logic to convert Appellee's ire (being "upset") at the prospects of M.H. receiving the sacrament of baptism to proof of a "substantial risk" of harm in the absence of delaying the baptismal ceremony to the age of 13.[1] Ergo, finding no sup-

---

1. Even if, for the sake of argument, we were to find the age of 13 not arbitrary as the point at which a child is mature enough to decide for herself or himself what religion should be practiced, if any, we find this time selection would interfere with a parent's right to raise their child as they see fit. *See Frank v. Frank,* 833 A.2d 194 (Pa.Super.2003), wherein we stated, in the course of discussing the zone of interests sought to be protected by 23 Pa.C.S. § 5301, that:

'The statute recognizes the right of parents to raise their children as they see fit without unwarranted governmental intrusion.' [...] A careful review of Section 5301

port in the record for the trial court's conclusion of stress/substantial risk of harm, the proposed restriction (delaying baptism to the age of 13) is equally ineffectual. *Zummo, supra.*

¶ 20 Order reversed.

shows it does not contain any provision protecting a child's right to choose which parent he or she resides with or what religion the child practices in contravention of a parent's choice. To do so[ ] would constitute an unwarranted governmental intrusion into the rights of parents to raise their children as they see fit because it would make a court the final arbiter between parents and children. That role has not been authorized for courts by the General Assembly.

*Frank,* 833 A.2d at 196. In this regard, absent a substantial threat of present or future physical or emotional harm to the minor child, as we find to be the case herein, the parent has the right to raise their child as he or she sees fit, which includes the practice of religion—a right which has not been relinquished to the courts by the General Assembly.