J-S12044-16

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | | |
|---|---|---|---|
| P.J.A., | : | IN THE SUPERIOR COURT OF | |
| | : | PENNSYLVANIA | |
| Appellant | : | | |
| | : | | |
| v. | : | | |
| | : | | |
| H.C.N., | : | | |
| | : | | |
| Appellee | : | No. 2395 EDA 2015 | |

Appeal from the Order July 7, 2015,
in the Court of Common Pleas of Lehigh County,
Domestic Relations, at No(s): 2007-FC-0427

BEFORE:    MUNDY, OLSON, and STRASSBURGER,* JJ.

MEMORANDUM BY STRASSBURGER, J.:    **FILED FEBRUARY 18, 2016**

P.J.A. (Father) appeals from the order entered July 7, 2015, which, *inter alia*, modified provisions of a prior custody order entered with respect to P.C.A. (Child).  Upon review, we affirm in part and reverse in part.

Father and H.C.N. (Mother)[1] met in New York in May 2005 and were married in February 2006.  Child was born in August 2006.  Father, Mother, and Child moved into a newly-constructed home in October 2006, and Father lost his job in March 2007.  The parties separated in late-March 2007.  "There was a rash of incidents over a brief period in March 2007, which

---

[1] With respect to the parties, we observe the following.  Mother is an attorney licensed to practice law in Arizona.  Throughout the course of the litigation, she has alternated between being represented by counsel and proceeding *pro se*.  For this appeal, she is *pro se*.  Father has also been represented by counsel and appealed *pro se* at different times in this litigation.  For this appeal, he is represented by counsel.

*Retired Senior Judge assigned to the Superior Court.

involved calls to police by both parties, arguments, claims of physical abuse by Mother against Father and claims of drunkenness by Father against Mother." Trial Court Opinion, 5/15/2009, at ¶ 20. "Each party initiated vindictive, immature and selfish acts against the other party beginning primarily in late 2006 and then throughout the next two years." *Id*. at ¶ 21.

On April 5, 2007, after a hearing before the trial court, it entered the first of several interim custody orders. That order provided, in relevant part, that Father would have temporary physical and legal custody of Child. Mother would exercise partial physical custody on a daily basis for a minimum of three hours per day as coordinated by the parties. On May 4, 2007, the parties agreed to a new custody schedule, in which Mother's periods of partial physical custody were set forth in a more specific manner. On November 20, 2007, the parties agreed to an interim order of court that provided Mother and Father shared legal and physical custody of Child.

On January 22, 2008, Father and Mother agreed to a final custody order. That order provided, in relevant part, that the parties shall have shared legal custody with primary physical custody to Mother subject to Father's exercise of partial physical custody at specified times, including alternate weekends, and other dinner and overnight visits. That order also included a holiday schedule.

On March 11, 2008, Father filed a petition for modification of custody. That petition was followed by several petitions for sanctions against Mother.

On January 16, 2009, Mother filed a petition for relocation. The trial court held hearings on March 23 through 26 and April 2, 2009 on these petitions. On May 15, 2009, the trial court entered an order denying Mother's petition for relocation. The trial court also ordered that Mother and Father shall have shared legal custody as well as equal, shared physical custody of Child.

After the entry of this order, the parties continued to proceed with their divorce, as well as litigate numerous petitions for special relief, sanctions, and contempt over disputes about a wide range of issues for Child including, but not limited to: out-of-country travel; visitation with grandparents; Child's aggressive behavior; information about Child's health and doctors; the custody schedule for Halloween; and selection of an after-school program. While many petitions were ruled upon, others were left unresolved.

On March 27, 2013, the trial court entered an order and opinion, by agreement of the parties, that it would conduct two rounds of hearings and then enter an order to resolve "all of the issues raised in these unresolved pleadings." Trial Court Opinion, 3/27/2013, at 2.[2] In its order and opinion issued after those hearings, the trial court addressed the statutory factors

---

[2] This order and opinion were authored by Judge Ford. Around March 2013, Judge Ford, who was the judge on this case *ab initio* and for all proceedings, was transferred to a different division of the trial court. Judge Reichly was assigned the case. He authored all subsequent orders and opinions in this case.

- 3 -

set forth in 23 Pa.C.S. § 5328(a). Notably, the trial court continued the joint legal and physical custody arrangement. The parties then continued their practice of filing numerous petitions for special relief, contempt, and sanctions.

On March 31, 2014, Mother filed a petition for sanctions and a complaint to modify custody. Specifically, she requested that the trial court grant primary physical custody to her. Mother filed an amended petition on May 9, 2014, averring that Father surreptitiously registered Child to play travel soccer in violation of a court order. That petition also averred that Father enrolled child in Holy Communion preparation (PREP) classes in violation of a court order. Thus, Mother requested both primary physical custody and sole legal custody of Child.

On June 3, 2014, Father filed answers to both petitions, a counter-petition, and a petition for contempt. Father also requested primary physical custody of Child.

Hearings were held on October 6 to 8, 2014, April 27 through May 1, 2015, and May 7 to 8, 2015.[3] On July 7, 2015, the trial court entered an order granting in part and denying in part the petition for modification. After an analysis of the statutory factors, the trial court continued the parties' shared legal and physical custody arrangement. The trial court also entered

---

[3] Both parties were *pro se* for these petitions and hearings.

more specific orders with respect to Child's religious upbringing and participation in sports.

Father timely filed a notice of appeal and concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i), and the trial court filed an opinion.

On appeal, Father asks this Court to consider the following: "Does the lower court's custody order further the best interests of [Child]?" Father's Brief at 4. Specifically, Father sets forth four issues for our review:

> A. The trial court erred by substantially limiting Father's ability to present his case.
>
> B. Even if remand is not warranted, the record establishes that Father should have been awarded primary physical custody.
>
> C. The lower court's restriction of Father's ability to practice his religion with [Child] is contrary to this Court's precedent.
>
> D. There is no evidence in the record to suggest that [Child's] participation in sports, or Father's choice to coach his son, is detrimental to [Child].

*Id*. at 10, 13, 14, 16 (unnecessary capitalization and bold-type omitted).[4]

---

[4] Father's brief violates Pa.R.A.P. 2116(a), which provides that "[n]o question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby." "[A]s a practical matter, this Court [dismisses] appeals for failure to conform to the Rules of Appellate Procedure only where the failure to conform to the Rules results in the inability of this Court to discern the issues argued on appeal." *Kern v. Kern*, 892 A.2d 1, 6 (Pa. Super. 2005). Despite Father's one question statement of questions involved, which expands to four separate questions in his argument section, we will not dismiss Father's appeal for failing to conform to Pa.R.A.P. 2116(a). Although we do not condone this format, we are able to discern Father's arguments.

We set forth our well-settled standard of review when considering a child custody order.

> In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*E.R. v. J.N.B.*, ___ A.3d ___, 2015 WL 8717198, at *5 (Pa. Super. 2015) (quoting *V.B. v. J.E.B.*, 55 A.3d 1193, 1197 (Pa. Super. 2012) (citations omitted)).

"When a trial court orders a form of custody, the best interest of the child is paramount.  The factors to be considered by a court when awarding custody are set forth at 23 Pa.C.S. § 5328(a)." *E.R.*, 2015 WL 8717198, at *5-6 (citations and quotations omitted).

> (a) Factors.—In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:
>
>> (1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S. § 5328(a).

Father argues that the trial court's "evaluation of the custody factors was improperly skewed in favor of Mother because the court precluded Father from presenting compelling, relevant evidence, the consideration of which would have resulted in a different consideration of the custody factors." Father's Brief at 10. Thus, Father requests that this Court reverse and remand "to allow Father to present this evidence." *Id*. at 13.

Father's chief complaint in this regard is the trial court's limitation of testimony to events occurring after the entry of the November 20, 2013 custody order.[5] The trial court stated that it was "not going to go back over

---

[5] To provide background on what led up to the trial courts limitation, we offer the following summary. On April 5, 2012, Father filed a petition for contempt alleging that Mother deprived Father of his custodial time such that he was unable to trick-or-treat with Child on October 28, 2011 (Halloween 2011). Halloween had been a source of contention each year, and in December 2010, the trial court ordered that Father was to have Child for Halloween 2011. Halloween 2011 would be celebrated on October 28,

ancient history from four years ago making a custody determination today."
N.T., 10/6/2014, at 167. Further, it would not deal with "an attempt to go
over a record which could have been or was created before Judge Ford years
ago." *Id*. at 171-72.

"[T]he admission or exclusion of evidence is within the sound
discretion of the trial court. In reviewing a challenge to the admissibility of
evidence, we will only reverse a ruling by the trial court upon a showing that
it abused its discretion or committed an error of law." *R.K.J. v. S.P.K.*, 77
A.3d 33, 41 (Pa. Super. 2013) (citations and quotations omitted).

The trial court explained:

---

2011, during Child's afternoon kindergarten class and for trick-or-treating
that evening. Father was to have custody from Friday, October 21, 2011 to
Friday, October 28, 2011. Mother's father died on October 20, 2011. So as
not to impede Father's custodial time, Mother asked her mother that she
wait a week for the funeral. Mother then scheduled a flight to the funeral for
herself and Child for the afternoon of October 28, 2011, several hours before
her custodial time began. Mother notified Child's school he would be missing
afternoon kindergarten, and sent Father an e-mail at 1:54 p.m. that
afternoon to tell Father that she was taking Child to the funeral. *See*
Father's Petition for Contempt, 4/5/2012; N.T., 1/25/2013, at 180-87.
Father did not receive that e-mail prior to arriving at the school where he
found out Child was not there. On March 27, 2013, the trial court dismissed
the petition for contempt because Father waited six months to file it.

At the October 6, 2014 hearing, Mother called Antoinette Clark to
testify. She is a friend of Father and the mother of Child's friend. Father
asked her about a conversation between the two of them that occurred in
the summer of 2014 where the topic of Halloween 2011 was raised. Mother
objected. The trial court ruled that the testimony was inadmissible as
irrelevant. N.T., 10/6/2014, at 166-67.

> It is significant to note that the parties in this case have a longstanding history of endeavoring to re[-]litigate issues previously addressed. Both parties are guilty of attempting to bring up past issues at hearings under the guise of demonstrating the other party's pattern of behavior over the years. The [trial court] is familiar with the parties' history and has communicated that to them. Moreover, Judge Ford has issued several orders and opinions addressing various issues the parties have raised over the years. It would not be productive to retread old ground in the form of testimony when there are volumes of Notes of Testimony thoroughly covering the parties' grievances with one another.

Trial Court Opinion, 8/26/2015, at 5 n. 5.

Based on the foregoing, it is evident that the trial court was very familiar with the facts of this case from the volumes of transcripts, orders, and opinions already issued in this case. The custody of Child has been litigated essentially since Child's birth, and we agree with the trial court that it would serve no legitimate purpose to rehash every issue with every petition to modify custody. Moreover, because the trial court was aware of the incidents that would affect the aforementioned custody factors, even if they were not specifically litigated during the most recent ten-day custody trial, we cannot see how the trial court committed an error of law or abused its discretion in weighing the custody factors on the record it had. Accordingly, Father is not entitled to a remand for a new custody hearing which includes this testimony, nor is he entitled to a re-weighing of the factors on this basis.

Father next contends that the trial court erred with respect to factor 13, which requires the trial court to assess "[t]he level of conflict between the parties and the willingness and ability of the parties to cooperate with one another…." 23 Pa.C.S. § 5328(a)(13). Father contends that the trial court should not have found this factor to be neutral, but should have been in his favor because of Mother's treatment of paternal grandmother.[6]

Instantly, the trial court set forth a thorough analysis of all of the factors. *See* Trial Court Opinion, 7/7/2015, at 3-12. It determined that of the seventeen factors, nine were neutral; three were not relevant or considered; four weighed slightly in favor of Mother; and one weighed in favor of Father. We observe that even if the trial court found that factor 13 weighed in Father's favor, rather than being neutral, we are not convinced it would have tipped the scales such that the trial court would have granted Father primary physical custody.

Additionally, with respect to factor 13, the trial court offered the following detailed analysis:

> Both parties are guilty of being so obsessed with finding flaws in the other's parenting skills that the [c]ourt is amazed the parties' behavior has not had a more detrimental effect on [Child]. From [Mother's] perspective, [Father] has deliberately

---

[6] "[Child's] paternal grandmother often picked up [Child] from school and [Child] was with her on numerous occasions when [Father] got home from work. [Mother] engaged the services of private investigators to spy on [Father] and [paternal grandmother] in order to prove that [Father] was not personally exercising some of his periods of physical custody." Trial Court Opinion, 8/26/2015, at 14-15.

enrolled [Child] in athletic activities which so dominate [Child's] time out of school that [Mother] felt she was not able to schedule any events herself with her son. [Mother] accused [Father] of scheduling birthday parties for [Child] giving her little advance notice. She accused [Father] of scheduling medical appointments for [Child] at inconvenient times without consulting her, of failing to give [her] sufficient notice he was going to be late picking up [Child] for weeknight dinner visits, and for dishonestly telling [Child's] school he was only a few minutes away in order to allow for release of [Child] to paternal grandmother when in fact [Father] is consistently out of the area at the time he asserted he would assume physical custody of [Child]. [Mother] has accused [Father] of manipulating his employment status to falsely claim he was available to care for [Child] when in fact he was not, of attempting to encourage [Child] to provide information about [Mother's] private life, and for encouraging [Child] to disrespect [Mother's] decision-making and the legitimacy of her parenting decisions.

Alternatively, [Father] alleges [Mother] has engaged in emotionally aberrational behavior. He accused [Mother] of being mentally unbalanced and refusing to co-parent with [him] for [Child's] benefit. Often what [Father] characterizes as an unwillingness to co-parent is a lack of agreement by [Mother] with what [Father] has unilaterally determined is in the best interests of [Child], such as [Child] being baptized in a religious faith significantly different from [Mother's], enrolling [Child] in athletic teams without consulting [Mother] or gaining her assent, and insisting [Child] attend practices and games on [Mother's] custodial time. [Father] emotionally and passionately described his pride in his son's athletic abilities at such a young age, and how he is confounded by [Mother's] unwillingness to enable to [Child] to fulfill his athletic potential. A corollary objection from [Father] is [Mother's] unwillingness to allow [Father] to coach [Child] in every sport in which he participates, which [Mother] views as an underhanded method by [Father] to spend time with [Child] even during those days and times when [Child] is supposed to be in [Mother's] custody.

As alluded to above, because of the hostility between the parties, the [trial court] is compelled to resort to extraordinary delineation of the boundaries of each parent's custodial periods and responsibilities in order to reduce the possibility of more

conflict between the parties. Such limitations include prohibiting [Father] from participating as a coach on more than one of [Child's] athletic teams per school calendar year, and precluding [Father] from having [Child] accepted into [Father's] religious faith without [Mother's] written consent. [Mother] will be precluded from assuming custody at any time when [Father] is not personally available and present to take custody of [Child] for a weeknight dinner visit or from school, and will be prohibited from stalking the paternal grandmother when she fills in for [Father] to pick up [Child] from school. [Mother] is encouraged to accommodate [Child's] interest in participating in sports and Catholic religious services.

Trial Court Opinion, 7/7/2015, at 9-11.

It is evident that the trial court was aware of and accounted for Mother's behavior in stalking paternal grandmother as Father now argues. However, the trial court weighed that behavior with Father's behavior and concluded that this factor was neutral. Father's arguments largely amount to a contention that the trial court should have interpreted certain evidence in his favor or otherwise challenge the weight the trial court attributed to the evidence and its credibility determinations, which we may not disturb on appeal. *See R.L.P. v. R.F.M.*, 110 A.3d 201, 208 (Pa. Super. 2015). Thus, Father is not entitled to relief on this issue.

Father next argues that the trial court has interfered with Father's ability to practice Catholicism with Child. Father's Brief at 14-16. We provide the following background on this issue.

Father is a practicing Catholic. Mother was raised as a Lutheran and is currently a member of the United Church of Christ. The issue of Child's

- 13 -

religious upbringing has been in dispute from the inception of this custody action.

The trial court's first custody order provided the following with respect to baptism of Child. Father "agrees that he will not make any major decisions without consulting and the consent of [Mother]." Trial Court Order, 4/11/2007, at 3 (unnumbered). However, the following ensued shortly thereafter.

> 24. Notwithstanding a specific court prohibition, on April 26, 2007, Father registered [his family] at St. Joseph the Worker Church in Orefield, Pennsylvania. He registered [Child] for Catholic baptism. He registered for the August 4, 2007, baptismal workshop. Then he scheduled [Child's] baptism for late 2007. He chose the Godparents for [Child]. All of this was done without the knowledge and consent of Mother even though she shared legal custody with him at the time.
>
> 25. On December 2, 2007, Mother, with her friend, Colleen Geiger, went to St. Joseph's church in the early afternoon. They saw vehicles with New Jersey plates.[7] Inside the church was Father with [Child] and party assembled for [Child's] baptism. [Child] was baptized.

Trial Court Opinion, 5/15/2009, at ¶¶ 24-25 (footnote added).

A subsequent custody order provided that the "parties have agreed that [Child] may be raised in both the Catholic and [other Christian] faiths until such time as [Child] is old enough to choose a faith for himself." Trial Court Order, 2/1/2008, at 15. The next custody order provided that

> [e]ach parent may provide religious instruction to [Child] during each parent's respective period of custody; however, neither

---

[7] Father's parents and family resided in New Jersey at that time.

parent shall denigrate the religion of the other parent nor discourage [Child] from participating in it. It is appropriate that the parental approach to religious issues in respect to [Child's] religious training and practice be discussed in therapy.

Order, 5/18/2009, at 6.

These issues arose once again when it was time for Child to be enrolled in preschool. Father wished for Child to be enrolled for pre-school at St. Joseph the Worker Catholic Church. The trial court ordered that Child be enrolled at a different preschool that was not associated with any religion. When Child reached elementary school age, Father again petitioned the trial court to enroll Child at St. Joseph the Worker Catholic School. On March 8, 2011, the trial court ordered that Child be enrolled at public school for kindergarten. Father filed a notice of appeal from that order. The trial court authored an opinion, which stated, *inter alia*, that "for each parent to be on equal footing in providing religious instruction for [Child], [Child] should not be placed in a Catholic curriculum particularly at the parish where the baptism incident took place." Trial Court Opinion, 4/20/2011, at 4.[8]

On September 9, 2013, Father enrolled Child in a program that "is a prerequisite to [Child] receiving Holy Communion or being an altar server." Trial Court Opinion, 11/20/2013, at 2-3. Father did not inform Mother of Child's enrollment in this program. On October 9, 2013, Father filed a

_____

[8] Father subsequently discontinued that appeal voluntarily.

petition for special relief to allow Child to practice his religion with Father. The trial court denied Father's petition.

On May 9, 2014, Mother filed a petition for contempt in which she averred that Child "is now enrolled in self-study classes necessary to participate in First Holy Communion." Amended Petition for Contempt and Complaint to Modify Custody, 5/9/2014, at ¶ 17. Mother requested the trial court to preclude Child from participating in First Holy Communion "in home, privately or during mass, … in any way shape or manner." *Id*. at ¶ 18.

Father responded that he "enrolled [Child] to participate in [PREP] during only Father's custodial weeks, with no impact to Mother's custodial time." Father's Answer to Amended Petition for Contempt, 6/3/2014, at ¶ 15. Father argued that this was not a violation of the prior custody order. Thus, the underlying facts are not in dispute; rather, the issue before the trial court was whether it was a violation of the custody order for Child to be enrolled in PREP even if it did not impede Mother's custodial time. The trial court modified the custody order to add the following with respect to Child's religious upbringing:

> g) Both parents are prohibited from enrolling [Child] in any catechism or religious training without the written or e-mailed consent of the other parent or further Order of Court.
>
> h) [Child] is precluded from receiving communion at any religious service without the written or e-mailed consent of each parent not less than 48 hours prior to the religious service.

Trial Court Order, 7/7/2015, at 19-20.

We now turn to an examination of the case law in this area. Both Father and the trial court point to this Court's holding in *Zummo v. Zummo*, 574 A.2d 1130 (Pa. Super. 1990). *See* Father's Brief at 15; Trial Court Opinion, 8/26/2015, at 10.[9]

In *Zummo*, Mother was Jewish and Father was Catholic, and at the time of the divorce, the children were eight, four, and three years' old. During the marriage, the family participated fully in Judaism. While the father participated in Catholicism "sporadically," the children were not exposed to it in any way. *Id*. at 1141 (emphasis eliminated). When the parents separated, the father stopped bringing the oldest child to religious school during his custodial time (the other two children were not yet old enough to start). The parents otherwise agreed on much in the way of custody, but asked the trial court to determine "to what extent father should be obligated to see to the attendance of the children at Jewish services during his visitation periods and whether father should be permitted to take the children to Roman Catholic services to the extent he attends on his visitation weekends." *Id*. (emphasis eliminated). The trial court held that Father must take the children to religious school even during his periods of

---

[9] We observe that *Zummo*'s precedential value is in question. In this three-judge panel decision, one judge wrote for the majority, one concurred in the result, and one dissented. This court has cited it as authoritative. *See Hicks v. Hicks*, 868 A.2d 1245 (Pa. Super. 2005). Our Supreme Court has noted that the lead opinion in *Zummo* did not garner another vote, thus depriving it of precedential effect. *Shepp v. Shepp*, 906 A.2d 1165, 1178 n.6 (Pa. 2006)(Baer, J. dissenting).

partial custody; however, Father was not permitted to take the children to "religious services contrary to the Jewish faith[.]" *Id*. at 1142. Father appealed from that order.

On appeal, this Court held "that each parent must be free to provide religious exposure and instruction, as that parent sees fit, during any and all period of legal custody or visitation without restriction, unless the challenged beliefs or conduct of the parent are demonstrated to present a substantial threat of present or future, physical or emotional harm to the child in absence of the proposed restriction." *Id*. at 1154-55. "[T]his standard requires proof of a 'substantial threat' rather than 'some probability.'" *Id*. at 1155. This Court noted further that "while the harm involved may be present or future harm, the speculative possibility of mere disquietude, disorientation, or confusion arising from exposure to 'contradictory' religions would be a patently insufficient 'emotional harm' to justify encroachment by the government upon constitutional parental and religious rights of parents, even in the context of divorce. *Id*. Accordingly, while this Court affirmed the order with respect to the father's requirement to take the children to religious school, it reversed with respect to taking the children to the father's services.

In the instant matter, the trial court concluded that *Zummo* was inapplicable, reasoning that "*Zummo* applies in cases where one party is

prohibited from exposing his or her child to that party's religion." Trial Court

Opinion, 8/26/2015, at 11.

> In this case, both parents are expressly permitted to expose [Child] to their respective faiths, Catholic and [United Church of Christ], during their respective periods of custody. On the issue of religious training, such as Sunday school, the parties must agree on [Child] receiving training from one institution or the other. This is because, for example, a Catholic cannot receive communion in a Lutheran church. These denominations are two branches of Christianity, but advancement in one is to the exclusion of the other. Because the parties share legal custody, the decision to allow [Child] to receive religious sacraments in one faith or the other is a joint determination. If they cannot come to an agreement, the impact of the Court's order is consistent with *Zummo*, to permit *both* parents to expose [Child] to their respective faiths. When [Child] reaches the age of majority, he would be in a position to determine for himself whether to receive additional sacraments such as Confirmation in either church. For the time being, the Court's decision is to allow for appropriate exposure to the two faiths. To the extent the parties can agree on [Child's] receipt of religious training, there are no legal obstacles preventing him from pursuing the appropriate educational and spiritual requirements of the faith upon which they agree.

*Id*. at 11-12.

Based on our review of the case law subsequent to *Zummo*, we

disagree with the trial court's interpretation. In *Shepp*, our Supreme Court

weighed in on this issue. In that case, while both parties were Mormon, the

father was excommunicated from the church because of his fundamentalist

belief in polygamy. When the parties divorced, the father wished to teach

their daughter about plural marriage, in the event that such a situation arose

in his family. The mother testified that it was the father's belief in polygamy

that caused the divorce. The trial court directed that the child continue her Mormon upbringing, but prohibited the father from teaching her about polygamy, particularly because the practice of polygamy would result in the commission of a crime.

On appeal, this Court affirmed the order of the trial court, reasoning that "that the teaching of plural marriage constituted a grave threat." *Id*. at 1173. However, our Supreme Court reversed that order, and offered the following:

> By their very nature, decisions involving child custody must focus on the character and conduct of the individual parents and children involved. Accordingly, there may be instances where restricting a parent from teaching a child about a sincere religious belief involving illegal conduct is appropriate. However, we emphasize that the illegality of the proposed conduct on its own is not sufficient to warrant the restriction. Where, as in the instant matter, there is no finding that discussing such matters constitutes a grave threat of harm to the child, there is insufficient basis for the court to infringe on a parent's constitutionally protected right to speak to a child about religion as he or she sees fit.

*Id*. at 1173-74. *See also Hicks*, *supra* (holding that a parent being upset at the prospects of the child being baptized in a different religion is not proof of a substantial risk of harm to the child so as to permit the court to interfere with a parent's free exercise of religion).

We now turn back to the instant matter. In this case, while each parent is permitted to expose Child to his or her respective religion, the trial court specifically limited the parent's ability to educate Child in his or her

religion. Such a limitation is contrary to our case law where there is no indication of a "substantial threat of present or future, physical or emotional harm to the child." **Zummo**, 574 A.2d at 1154. Accordingly, the trial court erred in concluding that Child was not permitted to be educated or participate in the sacraments at the Catholic church. Consistent with precedent, both parents shall be permitted to educate Child in and practice his or her religion with Child during their respective periods of custody, so long as there is no substantial threat of present or future physical or emotional harm to Child.

Finally, Father argues that the trial court erred with respect to Child's participation in sports, as well as Father's ability to coach him in those sports. Father's Brief at 16-21. We provide the following background.

The parties have been squabbling over Child's participation in sports and other extracurricular activities for a long time. On February 1, 2008, the trial court order required the parties to "consult with one another regarding any extracurricular activities that affect [Child's] time with the other parent." Trial Court Order, 2/1/2008, at 17-18.[10]

On August 14, 2012, Father filed a petition for special relief to allow Child to play team soccer. This petition arose out of a dispute between Mother and Father about then six-year-old Child's interest in playing team

---

[10] We note that at the time of this order, Child was only eighteen months old.

soccer. On September 11, 2012, the trial court ordered that Child shall be enrolled on a soccer team. Subsequently, the trial court ordered that Child participate in organized baseball, basketball, and soccer only through "the public youth association for his geographic area." Trial Court Opinion, 3/27/2013, at 13. That order further provided that "the parties shall cooperate on enrollment and [Child's] participation; and the parties shall only enroll [Child] in parochial or private club sports upon the parties' written agreement." *Id*.

In her amended petition for contempt and complaint to modify custody, Mother alleged on May 7, 2014, without her knowledge or consent, Father "unilaterally and covertly registered [Child] for a traveling soccer team whereby the parties' [*sic*] would be required to travel with [Child] to Delaware County and other distant counties...." Amended Petition, 5/9/2014, at ¶ 9.[11] Mother averred that travel soccer was both more costly and more time consuming. Tryouts were to occur on May 7, 2014 and May 12, 2014, during Mother's custodial time. Mother immediately informed Father she was not in agreement with travel soccer, specifically because it

---

[11] The two types of youth soccer discussed here are recreational (rec) soccer and travel soccer. Rec soccer takes place only during the fall, and games and practices are all at a local field. Travel soccer requires both more time and more expense. There is a fall season and a spring season, and an optional indoor soccer (winter) season. Games are played in surrounding counties and overnight travel is a possibility. The level of instruction and competition is greater, as travel soccer teams are composed of players who are selected for the team by a tryout process.

would interfere with Child's other "court-ordered extracurricular activities such as basketball and baseball." *Id*. at ¶ 12. Mother also asserted that it is her belief that Father is coaching Child in his extracurricular activities, and "is now utilizing his position as coach to thwart and undermine Mother's parenting time with [Child]." *Id*. at ¶ 20. In particular, Father, as Child's baseball coach, has scheduled baseball practices during Mother's Monday and Wednesday dinner visits.

On June 3, 2014, Father responded with a petition for contempt. In that petition, he set forth Mother's repeated refusal to accommodate Child's extracurricular activity needs. For example, he pointed out that during the 2012 rec soccer season, Mother did not bring Child to the first game that took place during her custodial time. Father also averred that in 2013, Mother enrolled Child for spring baseball, but did not "mention Father's desire to coach his son's team, thereby removing Father from consideration." Petition for Contempt, 6/3/2014, at ¶ 8.

With respect to the sports at issue in 2014, Father claims he informed Mother of the soccer tryout process. Initially, he claimed she did not respond to his e-mails, then he acknowledged that she wrote to him that she was not in agreement with Child participating in the May 7, 2014 tryout. Father then wrote an e-mail to Mother stating, "Why are you not agreeable to supporting our son's happiness?" *Id*. at ¶ 14. Both Mother and Father then sent the coach copies of custody orders to explain why Child should or

should not be permitted to play travel soccer. Mother did not take Child to the second day of tryouts; nevertheless, Child was selected for the team. Mother informed the organization that Child would not be participating. Father requested that the trial court order that Child be permitted to participate in 2014 travel soccer.

The trial court then heard extensive testimony about the differences between travel soccer and rec soccer. *See* N.T., 10/6/2014, at 35-137 (testimony of David Dean, Child's former rec soccer coach and current coach of the travel team); *Id*. at 121-142 (testimony of Marcus Arnfeldt, co-coach of the travel team). The trial court also heard testimony from friends of both parties about the parties' behavior at sporting events. Finally, the trial court heard the thoughts of both Mother and Father on these issues. Based on the foregoing, the trial court ordered that by July 15 of each year, the "parents shall ascertain if [Child] wishes to participate in travel soccer." Trial Court Order, 7/7/2015, at ¶ 17(f). The trial court provided further that if Child wished to participate in travel soccer, he would then not participate in baseball; however, Child could participate in any extracurricular activity upon written consent of each parent. Additionally, each parent is permitted to coach or lead one extracurricular activity per school year. *Id*. at ¶ 17(e).

The trial court offered the following detailed rationale as to how it reached these conclusions:

This Court has had extensive opportunity to observe both parties and has spoken to [Child], a very intelligent and articulate eight-year-old boy, *in camera* to receive his input.

Father casts his various actions in a light designed to create the appearance that they are purely intended to advance the best interest of the child. He encourages [Child's] participation in various sports activities and serves as coach. He spent an excessive amount of time offering testimony regarding the merits of a child playing on a team and experiencing sports. The Court accepted that testimony to the extent that there are certain benefits for a child playing sports, such as making friends, learning teamwork and other life lessons, and getting exercise. However, the order entered by Judge Ford permitting [Child] to play certain sports did [not] require [Child] to attend every practice, game, meet, etc.

While the Court has no doubt that [Father] enjoys serving as a coach for his son's teams, the evidence demonstrated that coaching also advanced [Father's] underlying efforts to intrude upon [Mother's] custodial time. For example, the evidence showed that [Father] left a voice message for [Mother] demanding that she bring [Child] to a game on January 17, 2015 after she e-mailed [Father] to advise him that [Child] had a birthday party to attend that day. This was during [Mother's] custodial weekend. When questioned whether he would send a similar voicemail to any other parent on the team, [Father] responded, "I don't because they're not my children." [Father's] insistence that the applicable court order mandated that [Mother] bring [Child] to every game and practice was both a mischaracterization of Judge Ford's order and a way by which to intrude upon [Mother's] custodial time.

[Father's] other argument with respect to sports is that [Child] should be permitted to live up to his athletic potential. [Father] characterizes anything shy of that as detrimental to [Child]. This issue manifested in the context of the parties' dispute between enrolling [Child] in travel soccer as opposed to the non-traveling team. [Father] argued that [Child's] level of skill at soccer was commensurate with the higher level of competition associated with the traveling team. [Mother] did not dispute this fact, but opposed [Child's] enrollment in the travel team for other reasons, such as cost and the attendant time

commitment. [Father's] sole focus on the surface is his belief that [Child] should live up to his athletic potential to the exclusion of other relevant considerations. However, underlying this is [Father's] motivation to attain additional time with his son beyond that allocated to him in the custody order. [Father] also regularly attempts to classify any disagreement between him and [Mother] as a perceived violation of a court order.

[Mother], by contrast, places her focus on taking [Child] to various non-sports activities, such as Boy Scouts, local plays, and other activities. During her custody time, [Mother] prioritizes these activities over sports regardless of whether it means that [Child] is prevented by virtue of the schedule from participating in practices or games. [Mother] argued that [Child's] schedule was overbooked between academic requirements and sports participations. Taking both parties' positions into consideration, as well as [Child's] well-reasoned preferences, the [court] fashioned an order that allowed [Child] to participate in sports without giving [Father] the leeway to infringe upon [Mother's] custodial time.

Trial Court Opinion, 8/26/2015, at 13-14 (citations to notes of testimony omitted).

On appeal, Father essentially argues that Child should be permitted to play two sports in the spring: soccer and baseball. Father's Brief at 17. Father argues that the trial court's order forces Child to make a choice "between playing spring baseball and relegating himself to recreational soccer in the fall; or playing soccer at the level he is actually qualified for (in the fall and spring) but skipping baseball." *Id*. at 17-18. Father contends that unless Mother could prove that Child would be "harmed playing two sports in the spring[,]" the trial court erred in its order. *Id*. at 19. Father also states that the trial court erred in limiting the parties to leading or

coaching one activity per school year. Father claims that Child is not harmed by having Father coach; Mother can also attend all practices and games; and, Father suggests that he does not even spend extra time with Child when he is coaching "because he is preoccupied with coaching ten other little boys as well." *Id*. at 20.

Despite Father's protestations to the contrary, the trial court did not abuse its discretion in fashioning its order. Once again, Father's arguments largely amount to contentions that the trial court should have interpreted certain evidence in his favor as being in the best interests of Child. The trial court worked to create an order taking into account the preferences of both parties, as well as Child, to create balance and ensure the best interests of the Child. Simply because Father continues to believe that Child should play travel soccer, along with any other sport Child wishes, does not mean the trial court erred or abused its discretion. Accordingly, we conclude that Father is not entitled to the relief he requests.

Before we conclude this memorandum, we feel compelled to point out that the record demonstrates that the order of shared legal custody may no longer be in Child's best interests. Legal custody is defined as "[t]he right to make major decisions on behalf of the child, including, but not limited to, medical, religious and educational decisions." 23 Pa.C.S. § 5322.

> [I]n order to support a decision of shared [legal] custody, the court must make a determination that the parties are capable of cooperating, even minimally.… Such a finding is

essential to an award of shared custody. The rationale behind this requirement is that if the parties are unable to cooperate minimally shared custody is unworkable and inappropriate. However, no more than a finding of minimal cooperation is required based on the pragmatic realization that no couple, divorced or intact, agrees on every important decision in the upbringing of their children. If the court intends to award shared custody, then the order must be premised on the parties' equality in decision-making. One of the predicates of a shared custody order is a finding by the court that the parties are capable of cooperating minimally.

*Hill v. Hill*, 619 A.2d 1086, 1089 (Pa. Super. 1993).

Instantly, the trial court itself points out over and over again the extent to which the parties cannot agree on even the most basic issues related to Child. The trial court recognizes that "[b]oth parties have engaged in efforts to undermine the other. They rarely are directly confrontational with one another, instead resorting to passive aggressive emails and other communications." Trial Court Opinion, 8/26/2015, at 12. The trial court has attempted to maintain shared legal custody by creating lengthy custody orders which go into great detail about Child's life in order to stem the tide of litigation that has surrounded these parties.

The record in this case reveals that such efforts have not worked. Just one month after the custody order at issue was entered, Mother filed a petition for contempt. A hearing was held on September 8, 2015 regarding several issues, including travel soccer and vacation time with Child. It is apparent that minimal cooperation does not exist between Mother and Father. While both purport to act in Child's best interests, the reality is that

neither is doing so. By continuing the practice of filing petitions for contempt and special relief on a monthly basis, the parties are asking the trial court to act as Child's legal custodian. This situation cannot and should not continue.

Based on the foregoing, and the issues before us, we affirm in part and reverse in part the July 7, 2015 order of court.

Order affirmed in part and reversed in part. Jurisdiction relinquished.

Judge Mundy concurs in the result.

Judge Olson concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.

Prothonotary

Date: 2/18/2016